(87 South. 833)

### WALKER v. STATE. (6 Div. 127.)

(Supreme Court of Alabama. Jan. 13, 1921.)

**1. Homicide ⬅194—Details of previous encounter leading up to shooting held properly excluded.**

In a prosecution for homicide, where it appeared that earlier in the evening accused had a difficulty with a white boy, and thereafter a crowd of men threatened to attack him, but, on his retreating to his father's house, they returned to the town and secured the assistance of a marshal, who was shot by accused when he and the men approached the house, evidence of the occurrence of the previous encounters was admissible to show the state of mind of accused, and as tending to give basis for his apprehension, but it was not error for the court to exclude evidence of the details of what was said and done at those encounters.

**2. Homicide ⬅296—Requested charges on authority of town marshal outside of town held not abstract.**

In a prosecution for homicide occurring outside the town limits, where it appeared that deceased was the town marshal, who had gone to the place at the request of men who had had trouble with accused earlier, and that deceased was referred to by the witnesses as an officer, requested charges by accused that the officer had no more authority on the premises than private citizens were not abstract, and it was error to refuse them, especially where one juror had asked the judge as to the authority of deceased, and had been told that was not in the case.

**3. Homicide ⬅118(3)—Person is not bound to retreat from his dwelling or curtilage.**

A person attacked in his own dwelling is not bound to retreat before defending himself, and this doctrine applies also to the curtilage.

**4. Homicide ⬅118(3)—Guest in dwelling of another is entitled to same protection as occupant.**

The right to defend one's self without retreating while within the dwelling extends to guests in a dwelling house, as well as to the owner or more permanent occupants thereof.

**5. Homicide ⬅118(3)—Dwelling house can be used only for defense.**

The protection of the dwelling house is given for defensive purposes only, and cannot be used for any offensive purpose.

**6. Homicide ⬅300(7)—Charge accused was required to retreat held erroneous under the evidence.**

Where defendant's theory, sustained by evidence, was that he fired the fatal shot while he was within the yard surrounding his father's house, from which he was going to his own house next door, when he was accosted in the dark by a crowd, who refused to explain their presence, it was error for the trial court to instruct the jury that the law required accused to retreat under the circumstances, whether he was in the yard or in the house.

**7. Homicide ⬅118(3)—Yard outside dwelling house is within curtilage.**

Accused was within the curtilage of his father's dwelling, while crossing the yard surrounding it to the fence, which separated it from his own premises, so as not to be required to retreat when attacked there.

**8. Criminal law ⬅380—Defendant cannot be cross-examined as to prior difficulties.**

A defendant cannot, on cross-examination, be questioned as to prior difficulties with other persons, though he had introduced witnesses to testify to his good reputation for peace and quiet, and those witnesses could have been cross-examined as to such previous difficulties.

**9. Criminal law ⬅1170½(2)—Qualified denials do not make cross-examination as to previous difficulties harmless.**

Error in permitting cross-examination of accused as to previous difficulties was not rendered harmless by answers denying the difficulties, where such denials were greatly qualified, and many of the questions were of such character as to allow race prejudice and passion.

Appeal from Circuit Court, Jefferson County; H. P. Heflin, Judge.

Henry Walker, Jr., was convicted of murder in the second degree, and he appeals. Reversed and remanded.

Appellant was indicted for the murder of one W. F. Granger, and convicted of murder in the second degree, and his punishment fixed at 25 years' imprisonment. He relied upon self-defense.

The deceased, a white man 63 years of age, was, at the time he was killed, town marshal of the municipality of Tarrant City. The defendant, who is a negro 23 years of age, lived at Dolcito, which was beyond the corporate limits and police jurisdiction of Tarrant City. The killing occurred on the night of March 20, 1920, in the front yard of Henry Walker, Sr., the father of the defendant, who resided next door to defendant. On the afternoon of the killing the defendant went hunting; returning to his father's home, he left his shotgun behind the kitchen door, and he and his wife went to visit relatives at or near Tar-

rant City. On their return home, and while passing Tarrant City, the evidence tends to show that defendant had an encounter with Elmer Connell, a 16-year old white boy—the latter testifying that he ran into the defendant's wife, and the defendant slapped him down. The questions asked the defendant as to what occurred, and whether or not he struck the boy, were objected to by the state. The defendant and his wife then proceeded on their way home, and in the meanwhile Connell told other boys and young men about the difficulty, and they (about eight in number) hired a jitney—some of the young men having pistols and flash lights—and went in pursuit of the defendant, overtaking him and his wife at the foot of the hill near his father's house. Some of the crowd got out of the jitney and ran in the direction of the defendant.

The defendant's evidence tends to show that at that time they holloed, "shoot him!" applying an opprobrious epithet, and "also shoot her!" The defendant and his wife then went into his father's house. The crowd then decided to return, and the evidence tended to show that they went to Tarrant City, and applied to "Judge" Thomas, a justice of the peace, to procure a "search warrant" for him, which was refused. They then proceeded to find the town marshal (the deceased), referred to in the evidence of "Officer Granger." This was about 8 o'clock at night, dark and drizzling rain. Granger agreed to accompany them to defendant's house, or to his father's house, where he was at the time. The evidence tends to show there were about nine in the car on the second trip, that the car was not stopped as near to the house as on the first trip, and that the lights were extinguished, and five members of the crowd started up the hill to the house of defendant's father. This was about 30 or 40 minutes after the first trip. Officer Granger and one Sandlin had flash lights, the latter having a pistol also; but no witness testified that Officer Granger was armed, although a scabbard and cartridge belt were found on his body. During this intervening time the defendant and his wife remained in his father's house with the rest of the family. The house of defendant's father was L-shape, with two front entrances, one at the west and another on the east of the house. Defendant's house was east of and adjoining his father's—a fence being on the dividing line, with a gateway between, being located in the northeast corner of the elder Walker's front yard, and there was a distinct pathway leading from the eastern front entrance to the gate.

The evidence for the state tended to show that Officer Granger and Sandlin approached the front entrance of the house, and had reached the spot near the steps of the front porch, but had neither called out nor flashed any lights, when suddenly a gun was fired from the door of the house, and Granger was killed. The defendant's evidence was to the effect that, after remaining in his father's house some 30 or 40 minutes, he and his wife decided to go home, and started through the kitchen and dining room out into the yard, and into the path leading to the gateway between his premises and that of his father's, and that at this time he did not know any one was at or near the premises; that as he passed through the kitchen he picked up his gun, which he had previously left there, and as he reached a point in the path in his father's yard, near the end of the front porch, a flash light was turned upon him, and he saw some one near the steps, and he called "Who's that?" and then another flash light, and another. With three flash lights on him, and asking "Who's that?" and receiving no reply, he fired the gun without placing it to his shoulder; that at the time he fired the man who was near the steps was coming toward him. The defendant offered evidence to substantiate this theory, and further testified that he never had had any trouble or difficulty with Officer Granger, and did not know him. He went to the home of relatives that night, and the next morning surrendered. The defendant offered numerous witnesses who testified to his good character for peace and quiet.

The defendant, testifying in his own behalf, was asked upon cross-examination by the state numerous questions as to any other difficulties or troubles he had had. Some of the questions asked were:

"Q. Haven't you had several difficulties with white people out there? A. No, sir.

"Q. Have you had any difficulties out there? A. I have had but one.

"Q. Who was that with? A. A gang of boys got after me down there one night.

"Q. I will ask you if you had any difficulty with a motorman or conductor on the Boyles line. A. No, sir; a motorman snapped a pistol in my face one day.

"Q. Then you did have a difficulty with a motorman or conductor on the Boyles car line? A. It was a colored fellow on there.

"Q. When was that? A. It was about three weeks before this happened.

"Q. I will ask you if in the presence of G. L. Ellis you cursed a motorman, and said that you would not let no white man run over you. A. No, sir."

The state then asked if he knew a small white boy by the name of Fred Williams, and if he had ever had any trouble with him. The defendant replied he had not had any trouble with him; "only me and him was playing over there."

Defendant interposed objections to each of the foregoing questions, and reserved exceptions to the action of the court in overruling the same, and likewise moved to exclude the answers in several instances. The defendant attempted to show everything that was said and done by the crowd on the first trip in

his pursuit, to which objection was sustained. The defendant also requested numerous charges to the effect that Officer Granger had no more right or authority upon the premises than any private citizen would have had.

The bill of exceptions discloses that one of the jurors asked the trial judge whether or not Officer Granger would.have a right to execute a warrant outside the municipality of Tarrant City, and was informed that that question was not before him. The court charged the jury in substance that the home of the defendant's father could not be considered the home of defendant, and whether the shot was fired from the house or from the yard it did not matter, for these premises would not be considered the home of the defendant, and that the law required him to retreat, if he could do so with safety to himself. Exception was reserved to this portion of the oral charge, and charges requested by the defendant to the effect that, if defendant had taken refuge and was a guest in his father's house, he was entitled to the same rights and privileges as to the doctrine of retreat as his father would have had, which charges were refused.

Ellis & Matthews, of Birmingham, for appellant.

Where an answer is responsive, it cannot be objected to, unless an objection was made to the question. 160 Ala. 584, 49 South. 323; 31 Ala. 108, 68 Am. Dec. 159. The objection that the answer is not responsive must come from the party asking the question. 157 Ala. 618, 47 South. 578; 116 Ala. 606, 22 South. 905; 169 Ala. 287, 53 South. 832. Unless palpably inadmissible, the objection must be specific. 17 Ala. App. 500, 86 South. 158; 106 Ala. 58, 17 South. 546. Any declaration, accompanying and characterizing the act, or connected with the main fact or transaction, is admissible as a part of the res gestæ. 159 Ala. 53, 48 South. 689; 133 Ala. 81, 31 South. 802, 91 Am. St. Rep. 17; 97 Ala. 215, 12 South. 176; 89 Ala. 63, 8 South. 110; 6 Ala. App. 594, 60 South. 499. Time alone does not determine whether a thing is of the res gestæ. 174 Ala. 63, 57 South. 245; 2 Ala. App. 38, 56 South. 89. Evidence tending to show that the defendant was guilty of another and separate offense is not admissible as a general rule. 42 Ala. 432; 109 Ala. 11, 19 South. 535; 83 Ala. 20, 3 South. 547; 6 Ala. App. 41, 60 South. 455. Where part of a conversation is put in evidence by one party, the other party may have the·whole conversation, although the original ·evidence was illegal. 17 Ala. App. 500, 86 South. 158; 131 Ala. 10, 31 South. 569; 91 Ala. 64, 9 South. 171. A person, a guest at the home of his father, may legally resist trespasses thereon to the same extent as if it were his own. 201 Ala. 512, 78 South. 866; 160 Ala. 7, 49 South. 905; 112 Ala. 1, 21 South. 214; 161

Ala. 259, 49 South. 895, 23 L. R. A. (N. S.) 996, 18 Ann. Cas. 636. The defendant was without knowledge or notice of the official character and presence of the officer, Granger. The offense is no more than ·manslaughter. 104 Ala. 171, 16 South. 68, 53 Am. St. Rep. 27; 181 Ala. 35, 61 South. 336. Counsel discuss other assignments of error, but without further citation of authority.

J. Q. Smith, Atty. Gen., and Lamar Field, Asst. Atty. Gen., for the State.

Evidence of a former difficulty is inadmissible as to detail. 197 Ala. 193, 72 South. 316; 191 Ala. 21, 68 South. 57; 116 Ala. 468, 23 South. 135. The rule of conspiracy has no application to this case, although the rule would have been different, had the defendant been killed and a member of the posse been on trial. 112 Ala. 77, 21 South. 65; 124 Ala. 59, 27 South. 272; 8 Ala. App. 187, 62 South. 575. A defendant, who testifies, may be subject to cross-examination and impeachment. 78 Ala. 474, 56 Am. Rep. 45; 89 Ala. 63, 8 South. 110; 99 Ala. 169, 13 South. .375; 100 Ala. 53, 14 South. 621. In any event the answer was favorable to the defendant. 150 Ala. 80, 43 South. 365.

GARDNER, J. The foregoing statement of the case sufficiently outlines the tendencies of the evidence for the state and the defendant, for a proper understanding of the important questions presented upon this appeal.

[1] There was no error in the court refusing to permit the defendant to introduce evidence as to everything that was said and done by each member of the "crowd" upon the first trip in pursuit of the defendant. We are of the opinion that the· details of what occurred between defendant and young Connell, when the defendant and his wife were passing through Tarrant City on their way home, are irrelevant, and should not become the subject of inquiry upon this trial. It is sufficient, both from the standpoint of the state and the defendant, to prove that at this time the defendant, who is a negro, had had an encounter with this young white boy, which, it is insisted, in any event, did not exceed a misdemeanor, and that thereafter a crowd of young white men procured an automobile and went in pursuit of the defendant, threatening him and making hostile demonstrations.

These are questions properly to be proven, as they shed some light upon the state of mind of the defendant, and tend to give basis for his apprehension upon their return when the tragedy occurred. It is without dispute that the defendant was not charged with the commission of any felony, and had committed.no offense in the presence of any officer; that there was no warrant for his arrest, and that he was beyond the limits of Tarrant

City, and without the jurisdiction of the town marshal thereof.

[2] It is insisted on the part of the defendant, and not controverted by counsel for the state on this appeal, that deceased, who was town marshal of Tarrant City, had no more authority on the premises than a private citizen; but the state contends that charges to this effect were abstract, as there is no direct evidence to show deceased was, at the time he was killed, acting in his official capacity for the arrest of defendant; but it clearly appears from this record that the jury might reasonably infer that the services of deceased were employed by these young men on account of his official capacity, and that he was in fact so acting. He was spoken of throughout the trial by all the witnesses as "Officer" Granger, and, as disclosed by the bill of exceptions, this very forcibly impressed one of the jurors, who asked the trial judge to charge as to the authority of Granger as an officer to make the arrest at that place. In view of the peculiar facts as here presented, therefore, these charges were not abstract, and we are of the opinion their refusal was error.

[3, 4] It was further without dispute that defendant had taken refuge and was a guest in his father's house on this occasion. It is a universal doctrine that a person assailed is not bound to retreat from his own dwelling, and this doctrine is applied to the curtilage, Madry v. State, 201 Ala. 512, 78 South. 866. where the authorities in this state are reviewed and reconciled or explained. This principle extends to guests in a dwelling house. As said by this court in Crawford v. State, 112 Ala. 1, 21 South. 214:

"The law has been long settled that a guest in a dwelling house is entitled to the protection the law affords to the owner or more permanent occupant."

See, also, Suell v. Dericott, 161 Ala. 259, 49 South. 895, 23 L. R. A. (N. S.) 996, 18 Ann. Cas. 636.

[5] This doctrine is for defensive purposes only, and cannot be used for any offensive purpose. As said in some of our previous decisions:

"No person is permitted by law to turn his castle from 'a shield to a sword.' * * * for * * * it is a shelter, but not a sally port." Montgomery v. State, 160 Ala. 7, 49 South. 902.

[6] It is not contended by defendant that, if the killing occurred as insisted by witnesses for the state, the deceased being fired upon from the open door of the house under circumstances as detailed in the record, this would not be murder. But upon this point there was sharp conflict; the defendant insisting, and offering proof to sustain the theory, that he fired the fatal shot while in his father's yard in the pathway leading to his home, which was next door, and while standing near his father's front porch, and under circumstances as outlined in the statement of the case, which need not be here repeated. The question of the duty to retreat, therefore, upon his theory of the case, becomes one of vital importance.

[7] It will hardly be controverted that under defendant's theory, the place where he fired the fatal shot was within the curtilage of his father's dwelling. Cook v. State, 83 Ala. 62, 3 South. 849, 3 Am. St. Rep. 688. He was therefore, under the law, entitled to the protection of the doctrine against retreat, the same as his father would have been, had the latter been charged with the killing. We are therefore of the opinion that the trial court erred in that part of the oral charge wherein he instructed the jury in substance that the premises of defendant's father would not be considered the home of defendant, and that the law required him to retreat, whether he was in the yard or in the house.

[8] Defendant, being examined in his own behalf, was, upon cross-examination by the state, asked numerous questions as to difficulties with other parties and at other times, in no manner connected with the offense with which he was charged. These questions might have been proper when addressed to witnesses who had testified for the defendant as to his character for peace and quiet, but were improper when propounded to defendant himself. Caldwell v. State, 160 Ala. 96, 49 South. 679; Clark v. State, 78 Ala. 474, 56 Am. Rep. 45. Rather a full discussion is presented in this latter case, and we take therefrom the following excerpt, as applicable here:

"When there is only the relation of a witness, the defendant may not be affected, other than as the credibility of one of his witnesses may be impaired; but, when the accused is himself the witness, not only may his credibility as a witness be affected, but his conviction may be obtained on his real or supposed commission of other and distinct offenses, when the evidence otherwise is in itself insufficient. To avoid such injustice, and to secure to the defendant a fair and impartial trial in the sense guaranteed by the law, the waiver of the constitutional immunity from compulsory self-examination should not be extended beyond facts which may be testified to by other witnesses, or which may be relevant to the issue, or may tend to elucidate it. Within these limits, the fullest cross-examination should be allowed; but its range into inquiries respecting past transactions and offenses, separate and distinct, is prohibited by the constitutional inhibition."

[9] It is contended by the state, if error was committed, it was without prejudice, for the reason the answers were in the negative. Some of the answers, while negative in substance, were greatly qualified, and many of the questions were of such character as to

arouse race prejudice and passion. Some of these will be found in the statement of the case. That these rulings were highly prejudicial we think is made clearly to appear from an examination of the record, and we consider further discussion unnecessary.

There are other questions presented, but which need not be considered, as they will not likely again occur. It results that the judgment of conviction will be reversed, and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and SAYRE and BROWN, JJ., concur.