398 So.2d 360 (1981)
Ernest Lee JONES, alias
v.
STATE.
2 Div. 294.
Court of Criminal Appeals of Alabama.
February 24, 1981.
Rehearing Denied March 31, 1981.
*361 Cartledge W. Blackwell of Gayle & Blackwell, and William T. Faile of Morris & Faile, Selma, for appellant.
Charles A. Graddick, Atty. Gen., and J. Anthony McLain and James F. Hampton, Sp. Asst. Attys. Gen., for appellee.
LEIGH M. CLARK, Retired Circuit Judge.
This is an appeal from a judgment of conviction and sentence for murder as defined by § 13A-6-2 of the Alabama Criminal Code, effective January 1, 1980, now codified as Title 13A of Code of Alabama 1975. The alleged homicide occurred after January 1, 1980. The punishment prescribed by § 13A-6-2(c) is "imprisonment in the penitentiary for not less than 10 years to life." The court fixed punishment at 25 years' imprisonment and sentenced defendant accordingly. By reason of his indigency, defendant was represented in the trial court by appointed counsel and for the same reason is represented by appointed counsel, the same counsel, on appeal. The indictment was returned on February 11, 1980, and the case is one of the first murder cases tried and appealed that is governed by the new Alabama Criminal Code, which contains major changes in the law of Alabama as to unlawful homicide, one of which being that instead of having two degrees of murder, as before, the statute omits degrees of murder and defines one method of committing the offense by stating in § 13A-6-2(a)(1):
"A person commits the crime of murder if:
"With intent to cause the death of another person, he causes the death of that person or of another person; ..."
Section 13A-6-2(b) of the Code provides:
"A person does not commit murder under sub-divisions (a)(1) or (a)(2) of this section if he was moved to act by a sudden heat of passion caused by provocation recognized by law, and before there had been a reasonable time for the passion to cool and for reason to reassert itself. The burden of injecting the issue of killing under legal provocation is on the defendant, but this does not shift the burden of proof. This sub-section does not apply to a prosecution for, or preclude a conviction of, manslaughter or other crimes."
The record shows that the trial judge wisely and carefully noted the changes that had been made by the new Code in the law of Alabama and correctly charged the jury to the satisfaction of all concerned, it seems, as to such changes. The oral charge included instructions as to the two lesser included crimes of homicide, "Manslaughter" and *362 "Criminally negligent homicide," as defined by sections 13A-6-3 and 13A-6-4 respectively, and the charge permitted a verdict under the evidence finding defendant guilty of either of said lesser included offenses.
The defendant pleaded not guilty and made no contention that he did not kill the alleged victim, Joseph Steadman, by shooting him with a shotgun, which the undisputed evidence shows that he did. He relied upon the defense of self-defense.
There is considerable conflict and confusion in the evidence as to specific details of what occurred a short time before and at the time of the fatal encounter, but a narrative of such details is not necessary at this time. The following brief summary is sufficient to show the basis for the conclusions we reach as to the issues presented.
The alleged victim was fatally wounded on the afternoon of January 7, 1980, while he was sitting in an automobile or was in the process of getting out of the automobile, while the automobile was stationary at the home of defendant's mother, where defendant was living or staying at the time, in Marion Junction, in Dallas County. There was a public road adjacent to a yard of the home. There is some question as to the exact position of the automobile with reference to the road and with reference to the yard, but the weight of the evidence seems to be that, at the moment the victim was shot, a substantial part of the automobile was in the yard, and probably the weight of the evidence was to the effect that the wheels of the automobile on one side were about the same distance from the edge of the road underneath the automobile as the wheels on the other side. The victim was not the driver but was sitting on the front seat of the automobile, on the side which at the time was the side closer to the house of defendant's mother.
The victim had been riding in the automobile with Willie Sawyer, the driver. They had picked up James Pryor, who rode in the back seat. After being in Marion, they went to Marion Junction to the home of Mag Jones, the mother of defendant. When they first drove up to the house, the victim, Joseph Steadman, went to the door and knocked, looking for Laura Jones, a young sister of defendant. Not finding her at home, Steadman returned to the automobile and the three went to another place nearby looking for Laura and soon returned to their previous position at the home of Mag Jones. While they were there, Laura got in the automobile and was sitting in the victim's lap, from which she left after being told by her mother to get out of Steadman's lap. Both Sawyer and Pryor testified to the effect that defendant came out of the house with a shotgun, came close to the automobile, fired one shot at Steadman hitting him in the head while Steadman was still sitting in the automobile. The evidence is undisputed that defendant then ran away, leaving the gun and went to Bessemer, Alabama, to a sister's house and through the intervention of his brother-in-law turned himself over to the authorities at Bessemer. Immediately after the shooting, Sawyer drove the automobile with Steadman and Pryor in it to a nearby service station, obtained the aid of law enforcement authorities and at their direction Steadman was taken to the nearest hospital. A post-mortem examination disclosed beyond question that he was killed by shot from the shotgun that entered the forehead above the right eye.
In its oral charge to the jury, the court explained the element of freedom from fault in bringing on the difficulty and the element of imminent danger, or the reasonable appearance of imminent danger, of serious bodily harm or death without objection or exception by either of the parties. The court then said:
"The third element is the one dealing with retreat. The law says that a person must retreat if he can do so without increasing his peril. It is better that one man should flee rather than another man should die.
"Now the law of retreat does not apply. The third element goes out the window if the person is in their own home. You do not have to retreat from your home or your place of work, but you do have to *363 retreat unless that qualification is met. If you were out on the highway and you can run without increasing your peril, then you have the right, the obligation to do so.
"Now those are the three elements, first of all, free from fault in bringing on the difficulty; second, danger of immediate bodily harm, serious bodily harm or death; and third, no way to retreat unless you are in your own home. If you're in your own home, and that doesn't mean out on the road in front of your home, that means in your home, you don't have any duty to retreat. A man's home is his castle."
At the conclusion of its oral charge, the court called for exceptions. After noting one exception by counsel for defendant unrelated to what the court had said as to "retreat" as stated above, the following occurred:
"THE COURT: Do you want anything about duty to retreat?
"MR. FAILE: Also, object to the Court commenting to the extent that the Court instructed the jury that the Defendant has a duty to retreat if he was out in the street. We feel
"THE COURT: (Interposing) If they find from the evidence. If they find from the evidence he was out in the street
"MR. BLACKWELL: (Interposing) I think our objection goes to two points. Number one was that you said that he had to be in the house and
"THE COURT: (Interposing) Yes, he does.
"MR. BLACKWELL: And it's our position that it's not the law, that he could be actually outside the house and, secondly, the question being outside, and I don't know if it was clear to the jury about being actually in the street, but there is a
"THE COURT: (Interposing) No, sir. I'll stand on that. If I'm wrong they're going to change the law because it says, "In your house." It doesn't say out in the yard. If you're in your yard, you can run. If you're in your own home or your place of business, you are under no duty to run. But being out in your yard or out in the street or wherever, so long as you are not in a dwelling, I think negates any idea of not having to retreat."
The court committed reversible error in the quoted portion of its oral charge. It precluded benefit to the defendant of the principle that one is under no duty to retreat when he is within the curtilage of his home, as well as when he is within the house itself. Madry v. State, 201 Ala. 512, 78 So. 866 (1918). The right to defend oneself without retreating while within his home or curtilage extends to guests in the home, as well as to the owner or more permanent occupants thereof. Walker v. State, 205 Ala. 197, 87 So. 833 (1921). In Walker, the accused was within the curtilage of his father's dwelling while crossing the yard surrounding it to the fence, which separated it from his own premises. The principles stated in the cases just cited have since been followed consistently. Collier v. State, 49 Ala.App. 685, 275 So.2d 364 (1973).
As previously indicated and as disclosed by pictures, the yard in which defendant was standing when he fired the gun and which was partly occupied by the automobile in which the deceased was sitting or leaving at the time, was small, and the house was only a few steps from the road and from the automobile. The situation was entirely different in Nunn v. State, 19 Ala.App. 619, 99 So. 738, 740 (1924), in which "the scene of the difficulty was out in the public road and some appreciable distance from the dwelling house of accused."
We do not agree with the position of appellee to the effect that the failure of defendant to request a written charge covering the matter under consideration disentitles him to a reversal by reason of the instruction given. Perhaps the position of appellee would be correct if the instruction were merely incomplete, if it had not limited the area from which defendant was not required to retreat to one's home or to one's place of work. It did so limit it by the *364 charge on the subject covered, generally, and specifically by the sentence, "You do not have to retreat from your home or your place of work, but you do have to retreat unless that qualification is met." The charge of the court on the subject is on the whole incorrect. Defendant's counsel made it clear to the court his basis for the objection or exception. The transcript shows that there was no disagreement between the court and counsel for defense as to terminology only, but that there was a disagreement as to the substance of what the court charged as to where a person is not under a duty to retreat, as to which the law requires us to agree with appellant. The trial court reiterated its view and gave expression to the steadfastness of such view by saying:
"But being out in your yard or out in the street or wherever, so long as you are not in a dwelling, I think negates any idea of not having to retreat."
Whether the particular error of the court constitutes reversible error, whether it caused substantial injury to defendant, would ordinarily depend to a great extent upon the evidence as to the existence vel non of both of the other two essential elements of a valid defense of self-defense. However, we see no need to go into detail as to such evidence, as the prosecution did not contend on the trial and does not contend here that there was not sufficient evidence to justify a submission to the jury of the issues as to both of such elements. We are convinced that the court was correct in submitting both issues to the jury. In addition to what we have said as to evidence on the point, we note that, according to evidence for the defendant, the victim had once previously threatened the defendant while they were at a pool room and that at the time the victim had a rifle "outside the place." As to another occasion, defendant testified that the victim threatened him while the victim had a gun. As to that incident, defendant testified:
"Q. Where on the railroad tracks?
"A. Down by my mother's house.
"Q. Did he threaten you then?
"A. Yes, sir; he did.
"Q. Did he have a weapon then?
"A. Yes, sir.
"Q. What did he have?
"A. A gun.
"Q. Did he threaten you with it?
"A. Yes, sir.
"Q. Did anybody else have any guns there then?
"A. Not that I can remember.
"Q. Did you have one?
"A. No, sir; I didn't.
"Q. What did you do?
"A. Ran."
By accepting what the court said as to defendant's duty to retreat, the jury could properly have come to no conclusion other than that defendant's defense of self-defense collapsed by reason of failure of defendant to retreat. The instruction took away from defendant a principle of law as favorable to him under the circumstances as any other principle applicable in the case. We have no doubt that the error probably resulted in substantial injury to defendant.
Appellant asserts that the court was in error in refusing defendant's written charge No. 19:
"I charge you, members of the jury, that the indictment, information, affidavit, or warrant of arrest in this case is not any evidence in this case and the fact that the Defendant was arrested is not to be considered by you as a circumstance against the Defendant, but said indictment, information, affidavit or warrant of arrest is merely the method of placing the Defendant on trial, but the presumption of innocence attends the Defendant throughout this trial and remains with Defendant and authorizes an acquittal, if the entire evidence fails to overcome the presumption of the Defendant's innocence, by proof of the Defendant's guilt beyond a reasonable doubt and to a moral certainty."
Appellant relies upon Salter v. State, 22 Ala.App. 86, 112 So. 538 (1927), in which the trial court was reversed for its refusal to give a charge containing a large amount of *365 the same language found in the above quoted requested charge. However, in Salter, supra, the charge was limited to a consideration of an indictment, as to which it has been repeatedly held that it is proper for the court to charge a jury to the effect that the indictment is not to be considered as evidence in the case. It does not follow, however, that a similar charge should be given as to an instrument that does not purport to be the actual charge upon which there has been an arraignment. Appellant's contention as to the refusal of the charge is without merit.
We disagree with appellant's contention that the court "erred in allowing toxicologist Craig Bailey to give testimony without being sworn." There seems to be some factual basis for the claim that the witness testified in an in camera proceeding without having been sworn, but when he was called by the State to testify in the case before the jury, the transcript recites that the witness, naming him, "called on behalf of the State, having been previously sworn, testified as follows." The record, rather than the statement and briefs of counsel, controls. Bush v. State, Ala.Cr. App., 333 So.2d 186 (1976).
Dr. Richard Roper, toxicologist of the Alabama Department of Forensic Sciences in the Montgomery Regional Laboratory, testified as to a post-mortem examination upon the victim of the homicide. Before his testimony was given, defendant's attorney asked to "take him on voir dire." The following then occurred:
"THE COURT: For what point, Mr. Faile?
"MR. FAILE: His identification of that body.
"THE COURT: All right.
"VOIR DIRE EXAMINATION.
"By Mr. Faile: You said the body was identified to you?
"A. Yes, sir.
"Q. Who identified it to you?
"A. Mr. Carl Murdox, a Medical Examiner and Field Agent in the Montgomery Laboratory.
"Q. That's the gentleman who just testified?
"A. That's correct.
"Q. He based his identification on the arm band; is that correct?
"A. Arm band and hospital information.
"Q. Hospital information? You based your identification on what he told you?
"A. What he told me and the arm band which I removed from the body.
"MR. FAILE: We renew our objection.
"THE COURT: Overruled."
The mother of the victim had testified, without objection, that he had died en route to the Baptist Medical Center in Montgomery, to which she went soon after his body arrived at the hospital. Mr. Carl Murdox testified that he looked at the body, removed a hospital arm band with the victim's name written thereon, which arm band was admitted in evidence, then delivered the body to the "City Morgue in Montgomery" and turned it over to Dr. Richard Roper. A picture of the body showing a bullet hole in the forehead of a person who substantially answers the description of the victim as shown in the evidence, was introduced in evidence. There was no semblance of any dispute as to the identity of the body. Defendant's objection to the testimony of Dr. Roper as to the result of the examination was properly overruled. Hopt v. Utah, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), when Utah was still a territory, relied upon by appellant, does not call for a different conclusion, although it was held therein that the testimony of a physician as to his post-mortem examination of a corpse was not admissible. In that case, there was confusion brought about by the presence of two corpses at a railroad depot at the same time, one in a metal casket and the other in a wooden coffin, with "generally similar" injuries and some testimony that the body identified to the physician for post-mortem examination was in a metal casket, while the father of the victim had testified that his body had been placed in a wooden coffin.
Another insistence on error to a reversal is based on an exception taken by defendant's *366 counsel directed to a portion of the court's oral charge in which it referred to the responsibility of one while he is intoxicated. The exception and the action of the court are shown by the following part of the transcript:
"MR. FAILE: We would except to the Court's oral charge in regard to the Court charging the definition of intoxication to the extent of it applying to the Defendant as there is no evidence in this case that the Defendant was intoxicated or had any alcoholic beverage whatsoever.
"THE COURT: If you will notice, I said Defendant, deceased, or any other witness. I put it in general terms. I did not single out the Defendant.
"MR. FAILE: The definition that you gave as to justification or whatever would have noWould not apply to the deceased anyway. There has been testimony as to the percent of blood alcohol and we don't see any objection to the Court defining that percentage to the jury in regard to the statutory interpretation and guidelines as to what is intoxicated and what is not, but our exception is to the general definition of intoxication as it applies to the Defendant or as applies to the deceased in this case as it doesn't apply.
"We would also request that the Court instruct the jury on the crime of assault and battery being a lesser included offense of the crime charged in the indictment and except to the Court's definition of criminal negligence."
There were references in the oral charge, which we think could well have been omitted, to the matter of intoxication, which seemingly were prompted by considerable evidence as to who had been drinking intoxicating liquor or beverage a short time before the fatal encounter. Perhaps the comments were influenced by the commendable desire of the court to instruct the jury with accuracy and fullness as to the principles of the law as to the effect of intoxication upon one's criminal responsibility for his conduct, as particularly set forth in Code of Alabama § 13A-3-2 and by the possibility that intoxication, if any, on the part of defendant at the time would have served to reduce the crime from which he might otherwise have been responsible to a homicide less than murder. Although we are not convinced that there was sufficient evidence in the case to support a conclusion that defendant was intoxicated at the time he shot the alleged victim, we can understand the court's willingness to give the defendant the benefit of any reasonable doubt on that point and to charge the jury accordingly. It appears from defendant's exception that he was then disclaiming intoxication and any and all reliance upon intoxication as a possible defense.
It is to be noted from the quoted portion of the colloquy between the court and defendant's counsel, after his first recital of an exception to the court's charge as to intoxication, that the court made it clear that it spoke of intoxication "in general terms" and that it did not "single out the Defendant." Counsel then stated that he didn't "see any objection to the Court defining that percentage to the jury in regard to the statutory interpretation and guidelines as to what is intoxicated and what is not" but that he had a different view as to "the general definition of intoxication as it applies to the Defendant or as it applies to the deceased in this case as it doesn't apply." Immediately thereafter, defense counsel requested the Court to "instruct the jury" on an entirely different subject. We think that defendant's exception was not sufficiently clear or specific to enable the court to determine that it was valid. In addition, we think that the charge of the court as to the subject of intoxication did not cause any substantial injury to the defendant.
We dispose of as unwarranted the final insistence of appellant, as to which he captions the issue: "Whether the trial judge made improper remarks prejudicial [sic] the Defendant." In this position appellant refers to disconnected incidents, one of which was as to the action of the court in reproving loud remarks or other noise made by witnesses while in the courtroom that could be heard by the jury. Another was *367 during the cross-examination of a witness for the State, shown by the transcript as follows:
"Q. If Earl said you and `Till' were drinking out of the orange cup, then
"MR. BLAIR: (Interposing) We object to that.
"MR. FAILE: It's cross-examination.
"MR. BLAIR: He's asking him to testify as to whether or not a witness was telling the truth or not.
"MR. FAILE: Cross-examination, Your Honor.
"THE COURT: Is that some magic word, Mr. Faile? I'll overrule the objection.
"Q. (Continuing) If Earl testified that you and `Till' were drinking out of an orange cup, some alcohol, then he was lying, is that right?
"MR. BLAIR: Objection to the form of that question.
"THE WITNESS: I don't know, I wasn't paying him no attention.
"THE COURT: I think the word `lying' is a little harsh. I'll sustain the objection.
"Q. (Continuing): He would have been mistaken then, wouldn't he?
"A. I wasn't paying that much attention."
We think there is much in the quoted portion of the transcript that is subject to just criticism, but little, if any, on the part of the court. An express target of appellant's contention is the statement by the court: "Is that some magic word, Mr. Faile? I'll overrule the objection." The court was doubtless referring to counsel's attempt to justify the question he was asking by saying twice that which the court well knew, that it was on cross-examination. Whether there was any sting in the question of the court, it is well that the attention of a trial attorney be called at times to the fact that any question, even on cross-examination, needs more to support its propriety than the mere fact that it is on cross-examination and that a trial judge is not aided in any way in determining whether the question is proper by a statement of the questioner that it is on cross-examination. A judge is not to be severely criticized for his pointedly bringing the bad habit to the attention of an attorney.
Another incident made the basis of the contention was during a hearing out of the presence of the jury in which the court said:
"I thought you would. Do you have anything else before we bring the jury in? Let's get it all out of the way. Now I'm getting tired of this foot dragging. We've been here an hour and thirty minutes now and we haven't accomplished a thing."
On another occasion, defendant's counsel made the following objection out of the presence of the jury:
"We are going to object, Judge, to the Court's facial expression showing a hostile attitude toward defense attorneys by their requesting to take the witness on for Voir Dire Examination. We make that in all due respect to the Court, we know the Court didn't mean to do it but it does create an unfair inference toward the jury and prejudices our client."
The court responded to the objection as follows:
"Let's change the word `hostile' to `annoyed.' "We walk in comfort in the footsteps of Justice Faulkner in Allen v. State, 290 Ala. 339, 342-343, 276 So.2d 583 (1973) as follows:
"The trial judge is a human being, not an automaton or a robot. He is not required to be a Great Stone Face which shows no reaction to anything that happens in his courtroom. Testimony that is amusing may draw a smile or a laugh, shocking or distasteful evidence may cause a frown or a scowl, without reversible error being committed thereby. We have not, and hopefully never will reach the stage in Alabama at which a stone-cold computer is draped in a black robe, set up behind the bench and plugged in to begin service as a circuit judge.
". . . .
"However, we do not think enough has been shown here to establish that the substantial rights of the defendant were injuriously affected by the alleged irregularities....
*368 For the error indicated in the court's oral charge as to the duty to retreat, the judgment of the trial court should be reversed and the cause remanded.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur.

ON REHEARING
LEIGH M. CLARK, Retired Circuit Judge.
In connection with appellee's application for a rehearing, it states:
"Comes now the State of Alabama as appellee in this cause pursuant to Rule 39(k) of the Alabama Rules of Appellate Procedure and requests that this Honorable Court add to or correct its opinion of February 24, 1981, to include the following facts:
"The following colloquy between the trial judge and counsel which appeared in this Court's opinion of February 24, 1981, on page 5, was not made in the presence of the jury:
"`THE COURT: Do you want anything about duty to retreat?
"`MR. FAILE: Also, object to the Court commenting to the extent that the Court instructed the jury that the Defendant has a duty to retreat if he was out in the street. We feel
"`THE COURT: (Interposing) If they find from the evidence. If they find from the evidence he was out in the street
"`MR. BLACKWELL: (Interposing) I think our objection goes to two points. Number one was that you said that he had to be in the house and
"`THE COURT: (Interposing) Yes, he does.
"`MR. BLACKWELL: And it's our position that it's not the law, that he should be actually outside the house and, secondly, the question being outside, and I don't know if it was clear to the jury about being actually in the street, but there is a
"`THE COURT: (Interposing) No, sir, I'll stand on that. If I'm wrong they're going to change the law because it says, "In your house." It doesn't say out in the yard. If you're in your yard, you can run. If you're in your home or your place of business, you are under no duty to run. But being out in your yard or out in the street or wherever, so long as you are not in a dwelling, I think negates any idea of not having to retreat.'"
Although the requested inclusion does not contain any facts shown by the evidence in the case, we are pleased to comply fully with appellee's request and have set forth above the mentioned "colloquy" in the language set out in the appellee's request, as was done in the opinion on original submission, and hereby state, as appellee requests, that it "was not made in the presence of the jury."
We add that the colloquy took place before the case was submitted by the court to the jury, before the jury retired to commence its deliberations and at a time when the court had an adequate opportunity to modify or supplement its oral charge to the jury, prior to the commencement of its deliberations.
We make it clear also, if we did not do so in the opinion, that the statements of the court found in the colloquy were not considered by us, and were not intended by us to be considered by others, as instructions to the jury. The colloquy, including the statements of the court, was set forth in order to show that there was a meeting of the minds of the court and counsel for the defendant as to the portion of the court's oral charge to which the defendant's objections were addressed, and the basis or grounds for such objections.
*369 OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All the Judges concur.