The appellant, Tomas Allen Snyder, appeals his conviction for murder and his sentence of life imprisonment imposed as a result of the application of the Habitual Felony Offender Act. He raises four issues on appeal.
The evidence adduced at trial shows the following: the victim, William Howell, was the manager of Night Moves I, a Mobile nightclub. He also was involved in the management of a companion nightclub, Night Moves II, to which he had access. One of Howell's responsibilities was to account for the proceeds of both clubs. His body was found on the floor of the kitchen of Night Moves II on April 5, 1991. He had died as a result of a gun-shot wound to the head. His briefcase, in which he was known to carry large amounts of money, was found near his body. In his briefcase were packages of rubber bands. Similar packages of rubber bands were later found in Snyder's automobile. Above the victim's body was a "vent-a-hood" where proceeds from the club were hidden for safekeeping. Snyder's fingerprints were found on the "vent-a-hood." Snyder was a frequent customer of Night Moves II.
On the night of the murder, Snyder was one of the last people seen at the club. Also on the night of the murder, Snyder left Mobile for Florida. The next day he contacted someone in Mobile who informed him that he was a suspect in the murder. Five days later, Snyder was observed by the Lake City, Florida, police participating in a suspected drug transaction. When he was approached by the Lake City police, he fled. When the Lake City police caught up with him, he pointed a 9-millimeter Tarus pistol at the officers. After he was apprehended, the pistol was seized. A ballistics expert later determined that the pistol was the murder weapon.
After Snyder was apprehended, the police took him to a hospital because his arm had been injured during the arrest. While they were at the hospital, Snyder again attempted to elude the officers by grabbing a scalpel and threatening a nurse. He was again apprehended and was turned over to the Mobile, Alabama, police, who came to Lake City to transport him to Mobile. During the trip, he asked to speak to Sergeant James Mayo, an investigator with the Mobile Police Department, and made the following confession to Mayo, who was travelling with him: "I broke into the club to rob it, he came in, scared me and I shot him."
Snyder testified in his own behalf at trial and denied any involvement in Howell's murder.
Snyder contends that the trial court committed reversible error by allowing the prosecutor, over his objection, to cross-examine him concerning a confession he had made to a crime committed in Wisconsin and by allowing testimony that crime was a murder. He also contends that it was reversible error for the trial court to admit into evidence his written confession to the Wisconsin murder.
When Snyder was being transported from Lake City to Mobile, he asked to speak to Sergeant Mayo. He asked Mayo for a pen *Page 1291 
and paper so that he could write a message that he wanted Mayo to deliver to someone. Mayo gave Snyder a pen and a notebook. Snyder then wrote something on a piece of paper in the notebook and handed the notebook back to Mayo. Mayo testified that, as Snyder handed him the notebook, Snyder said, "I broke into the club to rob it, he came in, scared me and I shot him." In the notebook, Snyder had written his full name, his Social Security number, his parents and ex-wife's addresses, his ex-wife's and his mother's telephone numbers, and a message to the sheriff of Waukesha County, Wisconsin. Until that time, he had been using the alias "Michael Overbay." The message pertained to a crime that had been committed in Wisconsin, and it reads as follows: "For Waukesha WI — Sheriff Dept. I was the only on [sic] involved — My brother had nothing to do with it. [/s/] Thomas [sic] A. Snyder."
During the presentation of the state's case-in-chief, the trial was interrupted for a suppression hearing pertaining to the admission into evidence of Snyder's confessions to the crimes in Mobile and in Wisconsin. At the conclusion of the suppression hearing, the trial court ruled that the oral confession to the crime in Mobile was admissible, but that the written statement admitting the commission of the crime in Wisconsin was not admissible. During the trial, several state witnesses testified on direct examination, without objection, that Snyder had passed a written statement to Mayo; however, the contents of the statement were not divulged other than that part where Snyder disclosed his correct identity and the names, addresses, and telephone numbers of his mother and his ex-wife.
During the direct examination of Snyder, he testified briefly about the written statement and his intent in making it, which, he said, was to inform the authorities of his true identity. He also denied making any oral statement to Mayo about the crime in Mobile. The record shows the following:
 "Q. [defense counsel]: And did you ask to speak to Mr. Mayo or had you asked for something other than Mr. Mayo?
 "A. I asked for a pen and paper and . . . Officer O'Shea . . . instructed me that Sergeant Mayo was the only one that could have contact with me and that he would inform him.
"Q. And did Sergeant Mayo appear?
"A. Several minutes later, yes.
"Q. Did he give you a pen and paper?
"A. Yes, sir.
 "Q. And did Sergeant Mayo — Did you say anything to him about the facts of this case?
"A. No, sir.
 "Q. Did you tell him that you just went in there to rob the man and got scared and shot him?
"A. No, sir.
"Q. That never happened?
 "A. No, sir. But I wanted to clear up as to who I really was because I knew who Mike Overbay was. I thought it was important to give my real name and who I was to the police.
 "Q. And you heard that you gave your ex-wife's phone number and your mother's phone number. Was that true?
"A. Yes, sir.
"Q. And you told them who you really were?
"A. Yes, sir."
On cross-examination, the following occurred:
 "Q. [prosecuting attorney]: Now, let's go to the 15th of April on the side of I-10, somewhere between Mobile and Lake City. Do you deny under oath that you told James Mayo 'I went into the club to rob it, the man scared me and I shot him'?
 "A. Sir, I deny saying verbally anything to James Mayo. I wrote him on a piece of paper and I gave it to him.
"Q. What did you write on that piece of paper?
 "MR. KNIZELY [defense counsel]: Your Honor, I object. It's irrelevant and immaterial to the issues before this Court.
 "THE COURT: Overruled. It was brought out on direct examination.
". . . .
 "A. Um — I wrote — to the best of my recollection I wrote my proper full name, my *Page 1292 
Social Security number, my mother and father's names, their address, my ex-wife's phone number, and I wrote a statement to the [Waukesha] Sheriffs Department.
 "Q. And what was the statement that you wrote to the [Waukesha] Wisconsin Sheriffs Department?
 "MR. KNIZELY: Your Honor, I object. The best evidence is the statement. It is not relevant to the issues before this Court.
"THE COURT: Overruled.
 "A. Um — to the best of my recollection I believe I stated my brother wasn't involved. I am not sure. I would have to refresh my memory.
 "Q. All right, sir. I am going to show you a document solely for the purpose of refreshing your recollection and ask you that you not display it to the jury.
"A. (Witness reading document.)
"Q. Does that document refresh your recollection?
"A. Yes, sir.
"Q. And is that your signature?
"A. Yes, sir.
 "Q. Do you now recall what you wrote to the [Waukesha] County Wisconsin Sheriff?
"A. Yes, sir.
"Q. What was it?
 "A. Um — 'I was the only one involved, my brother had nothing to do with it.'
"Q. And to what does that refer, sir?
 "MR. KNIZELY: Your Honor, objection. That has nothing to do with this case. And it has no relevancy or probative value in this case whatsoever. He has developed what he wanted to develop, what transpired at the roadside. Nothing further could be relevant to the issues in this case.
"THE COURT: Overruled.
". . . .
 "Q. Mr. Snyder, to what does this statement refer, quote: 'I was the only one involved, my brother had nothing to do with it'?
"A. With the delivery of cocaine, sir.
"Q. The delivery of cocaine?
"A. Yes, sir.
 "Q. It had nothing to do with a homicide which occurred in the State of Wisconsin?
 "MR. KNIZELY: Your Honor, I object. It assumes facts totally not in evidence.
"THE COURT: The witness said it was not.
 "Q. And do you deny under oath telling Officer Mayo that this statement, 'I was the only one involved, my brother had nothing to do with it,' had something to do with a homicide in the State of Wisconsin?
"A. I never said that to Sergeant Mayo.
 "Q. And did you ever say to Sergeant Mayo, and I am asking you this while you are under oath, quote: 'I went in to rob the place, the man scared me and I shot him'?
"A. I never said that."
 Sergeant Mayo testified for the state in rebuttal, as follows:
 "A. As I walked up to him he was finished writing. The last page — he folded — . . . [a]nd he handed it back to me.
"Q. So what did you say to him?
"MR. KNIZELY: The same objection, Your Honor.
 "THE COURT: I overrule the objection with the stipulation as the Court has stated.
 "A. I looked at the notebook and I asked him a question in regards to what he had written down as to why he wanted me to contact [Waukesha,] Wisconsin. And he said it was because he had killed a guy there."
The trial court instructed the jury that it could only consider the testimony pertaining to the alleged murder in Wisconsin for the purpose of determining Snyder's credibility and not for the purpose of determining his guilt or innocence. The trial court stated:
 "All right. Before the Court rules I want the jury to understand that I am going to overrule the objection. I am allowing this evidence to come in. But I am allowing this evidence to come in only as to the question as to whether or not it may go to the credibility of Mr. Snyder as a witness in this case. *Page 1293 
 "Sometimes it is referred to as impeachment testimony. But that is the only reason I am allowing it in. It is not to determine the guilt or innocence of the Defendant in this case, nor the guilt or innocence of the Defendant in any other matters that might be involved."
The trial court subsequently admitted the written confession into evidence as State's Exhibit 67, finding that it had been authenticated by Snyder's testimony.
It is not permissible in Alabama to prove the good or bad character of either a defendant or a witness to fortify or impeach his testimony by proving particular acts. Lowery v.State, 98 Ala. 45, 13 So. 498 (1893); Carroll v.State, 555 So.2d 805 (Ala.Cr.App. 1989). The rule in Alabama is stated as follows:
 "A witness may not be cross-examined for impeachment as to specific acts of misconduct by him which have no relevancy except as tending to show that he is a person of bad character as a whole or with respect to truth and veracity. . . .
". . . .
 "This rule of excluding questions on cross about specific bad acts of the witness does not apply to exclude prior criminal acts involving moral turpitude for which the witness has been convicted. . . ."
C. Gamble, McElroy's Alabama Evidence, § 141.01(10) (3d ed. 1977) (footnotes omitted).
 "One of the cardinal principles of the common law is that a person's character, good or bad, offered for the purpose of showing his conduct on a specified occasion, is not provable by evidence of his specific acts or course of conduct. The policy behind the rule is that the reception of such evidence would result in an intolerable confusion of the issues.
 "The most commonly applied form of the above principle is found in the rule that the criminally accused may not prove his good character, as tending to show that he did not commit the crime in question, by showing prior specific good acts. It is, of course, the right of the accused to introduce his good character but only by means of general reputation. Once the accused introduces evidence of his good character, the door is opened for the prosecution to rebut with proof of his bad character. However, the prosecution may not prove the accused's bad character by showing prior specific acts. The prosecution, like the accused, is relegated to proving character via general reputation."
Id. at § 26.01(1) (footnotes omitted).
The prosecutor, in cross-examining Snyder about the murder in Wisconsin, was attempting to prove, by means of an unrelated and immaterial bad act, that Snyder's character, as a whole and for truth and veracity, was bad. This was obviously the prosecutor's sole purpose in pursuing this line of questioning and in presenting this evidence. Evidence, if available, that Snyder was of general bad character, or had a bad reputation for truth and veracity, would have been admissible for purposes of impeachment. However, it is well settled in Alabama that particular independent facts, though bearing on the question of veracity, cannot be put into evidence for the sole purpose of discrediting the witness. Grooms v. State, 228 Ala. 133,152 So. 455 (1934); Carroll v. State, supra. In addition to the reason given in McElroy's for the policy behind this rule, i.e., that the admission of such evidence would result in an intolerable confusion of the issues, another important policy reason for the rule is that "[t]he accused may always be prepared to meet an attack on his general character, but cannot fairly be required, without notice, to defend against every possible aspersion which may be made against him, or to controvert particular facts." P. Herrick, Underhill's Criminal Evidence § 197 (5th ed. 1956) (footnotes omitted).
For these reasons, the admission of evidence relating to Snyder's commission of a murder in Wisconsin constituted error and, under the circumstances of this case, reversible error.
In view of the above, it is unnecessary to address in detail the other issues raised by Snyder on appeal. However, we point out for the guidance of the trial court, in the event of a new trial, that we believe that the *Page 1294 
photograph of Snyder with a shaved head was irrelevant to any issue in the case, and that its admission into evidence was prejudicial and erroneous. We also point out that Snyder's sentence was improperly enhanced by the use of two prior convictions based upon pleas of nolo contendere. Such convictions cannot be used in Alabama for enhancement purposes under the Habitual Felony Offender Act. See Davis v.State, 507 So.2d 1023 (Ala.Cr.App. 1986).
The judgment is due to be, and is hereby, reversed, and the case is remanded.
REVERSED AND REMANDED.
All Judges concur.