[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 655 
A jury convicted the defendant J.C. Woodall of murder done for a pecuniary or other valuable consideration or pursuant to a contract or for hire, an offense made capital by §13A-5-40(a)(7), Ala. Code 1975, and of attempted murder, §§13A-6-2 and 13A-6-2, Ala. Code 1975. The jury recommended the death sentence on the capital count by a 10-2 vote; the trial court followed that recommendation and sentenced the defendant to death by electrocution. On the attempted murder count, the trial court sentenced the defendant to a life term in the penitentiary. The Court of Criminal Appeals affirmed both convictions and the sentence of death, Woodall v. State, 730 So.2d 627 (Ala.Cr.App. 1997). We granted certiorari review, see Rule 39(c), Ala.R.App.P.; we now affirm the defendant's conviction and his sentence of life imprisonment on the count of attempted murder, but we reverse the judgment of the Court of Criminal Appeals affirming his conviction and his sentence of death on the murder-for-hire count, and we remand the case.
The facts of this case are stated in the opinion of the Court of Criminal Appeals. However, because we will address questions regarding the sufficiency of the evidence that were not presented to that court, we believe a statement of the facts would assist the reader.
Although he had lived in Kansas for many years, the defendant had been involved in a long-standing dispute with family members over certain real property located near Tallassee in Elmore County, Alabama. The defendant's strongest feelings of anger and resentment were directed toward his youngest *Page 656 
brother, Elmer "Stormy" Woodall, who had acquired the properly and lived on it. The state's evidence tended to show that in March or April 1989 the defendant approached a longtime acquaintance, John Kennon, and inquired whether Kennon would be interested in going to Alabama to kill someone there who had caused the defendant some problem over and money. Kennon declined, but told the defendant he knew someone who might perform such a task. Kennon introduced the defendant to Freddie Glenn Pope, who told the defendant he knew someone who would do the killing for $3,500, although Pope intended to carry out the killing himself. Pope testified that the defendant agreed to the price and later provided Pope with a picture that; included Elmer Woodall, to indicate the target of the "hit," and a map showing the area near Tallassee where Elmer Woodall resided.
Pope arrived in Alabama on Sunday, June 25, 1989, after driving from Kansas, and he proceeded to Elmer Woodall's property, intending to kill him. No one was home at that time, but Pope noticed a new automobile in the carport at the house; this concerned him, because the defendant had told him that Elmer Woodall lived alone. Pope returned to Elmer Woodall's house early the following morning, Monday, June 26, but found that the intended victim and several others were working on the roof of the house, and Pope also observed from a distance a woman near a pond behind the house. Pope approached Elmer Woodall and told him he was a contractor from Mississippi and was interested in purchasing a large quantity of gravel, and he also showed Elmer Woodall the map the defendant had given him to locate the property. Elmer Woodall immediately recognized the map as one that he had colored on with a yellow marker to indicate certain plots of the family real estate and then had mailed to the defendant in September 1988 in connection with settlement negotiations regarding litigation over the land. Pope testified that he left the property and telephoned the defendant from a pay telephone at a service station/convenience store in Montgomery. Pope said he questioned the defendant about the new automobile in the carport and the defendant told him that it probably belonged to his sister from Florida. Pope said he then told the defendant that he was concerned that the plan could not work because "that woman can't be around there," to which he said the defendant responded, "[I]f she gets in the road, she has got to go." Telephone records introduced at trial confirmed that on the morning of June 26, 1989, a two-minute call was placed from the Montgomery service station pay telephone to the defendant's home telephone in Kansas.
After waiting several hours, Pope returned to the house, where he noticed an elderly woman in the yard. That woman, who also resided at the house, was 81-year-old Clemer Woodall, the mother of both the defendant and Elmer Woodall. Pope approached Elmer Woodall and requested to use his telephone. As Elmer Woodall led him toward the telephone on the back porch, Pope pulled a pistol and said that "this is nothing about no telephone conversation . . .; this is a robbery." Pope attempted to force Elmer into the house, to prevent anyone from hearing gunshots, but Elmer began walking out toward the yard; Pope shot him in the head. Clemer Woodall, having witnessed the shooting of her youngest child, began screaming. Pope told her to shut up, but when she screamed again he shot her in the head, killing her. Pope then realized that Elmer was still making noises, so he shot him in the head again. Pope drove away, believing that both Elmer and Clemer Woodall were dead. Remarkably, however, Elmer Woodall survived and was able to provide information that allowed police to identify and arrest Pope. Pope confessed to the crimes, implicating the defendant and Kennon.
On July 14, 1989, an Elmore County grand jury returned a four-count indictment against J.C. Woodall, charging him with two counts of capital murder, under § 13A-5-40(a)(2) and (a)(7), Ala. Code 1975 (robbery-murder and murder-for hire), in connection with the death of his mother. Clemer Woodall; and one count each of the noncapital offenses of attempted murder, §§ 13A-6-2,13A-4-2, Ala. Code 1975, and assault in the first degree, §13A-6-20, Ala. Code 1975, in connection with the shooting of his brother, Elmer Woodall. The defendant was arrested in *Page 657 
Kansas, and Alabama authorities sought his return in order to have him stand trial. After protracted extradition challenges in the state and federal courts in Kansas, see Kennon v. State,248 Kan. 515, 809 P.2d 546 (1991); Kennon v. Hill, 44 F.3d 904
(10th Cir.), cert. den., 515 U.S. 1146, 115 S.Ct. 2586,132 L.Ed.2d 835 (1995), J.C. Woodall was delivered to Alabama authorities. In December 1995, after a trial in the Elmore County Circuit Court, he was convicted of capital murder on the count based upon § 13A-5-40(a)(7) and was convicted of attempted murder.
In his brief, the defendant presents over 25 issues for review. However, we find it necessary to address only three issues: (I) Whether the evidence was sufficient to sustain the defendant's conviction on the capital murder count, (II) whether there was sufficient evidence to corroborate the accomplice testimony to sustain the defendant's conviction on the capital murder count, and (III) whether the state's cross-examination of the defendant regarding his character and the subsequent introduction of evidence of three incidents involving uncharged misconduct required reversal of the capital murder conviction. The opinion of the Court of Criminal Appeals did not address any of these three issues; apparently they were not presented to that court. However, because this is a case in which the death penalty has been imposed, our review allows us to address any plain error or defect found in the proceeding under review, even if the error was not brought to the attention of the trial court. Rules 39(k) and 45A, Ala. R.App.P.[1] "`"Plain error" arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings'" Exparte Womack, 435 So.2d 766, 769 (Ala.), cert. denied,464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). "`In other words, the plain-error exception to the contemporaneous objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Ex parte Land,678 So.2d 224, 232 (Ala. 1996), quoting United States v. Young,470 U.S. 1, 106 S.Ct. 1038, 84 L.Ed.2d (1985), quoting UnitedStates v. Frady, 456 U.S. 152, 163, n. 14, 102 S.Ct. 1584,71 L.Ed.2d 816 (1982). This Court may take appropriate action, however, when the error "has or probably has adversely affected the substantial rights of the petitioner." Rules 39(k) and 45A, Ala. R.App. P. We note that a failure to object at trial, while not precluding our review, will weigh against any claim of prejudice. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886,112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
 I.
The defendant contends that his capital murder conviction and death sentence must be reversed because, he claims, the evidence was insufficient to support his conviction of the capital murder-for-hire of Clemer Woodall, as charged in the indictment. More specifically, the defendant argues that, even if there was sufficient evidence to indicate that he procured Pope to kill Elmer Woodall, there was insufficient proof indicating that he specifically intended that Pope kill Clemer Woodall, his mother.
No defendant can be found guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony-murder doctrine. Beck v. State, 396 So.2d 645, 662
(Ala. 1981); see also Enmund v. Florida, 458 U.S. 782, 797,102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (holding that imposing the death penalty upon the driver of a getaway car who did not "himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" *Page 658 
constitutes cruel and unusual punishment). However, this Court has written:
 "[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony. Ritter v. State, 375 So.2d 270
(Ala. 1979). An accomplice to the intentional killing is one who aids and abets the killing by any assistance rendered through `acts or words of encouragementor support or presence, actual or constructive, to render assistance should it become necessary.' Id. at 274."
Ex parte Raines, 429 So.2d 1111, 1112 (Ala. 1982). Thus, one who hires another to commit a murder may be convicted of the capital offense delineated by § 13A-5-40(a)(7), Ala. Code 1975, under the doctrine of accomplice liability. See Haney v. State,603 So.2d 368, 380 (Ala.Cr.App. 1991), aff'd. 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S. Ct. 1297,122 L.Ed.2d 687 (1993); see also § 13A-2-23, Ala. Code 1975. "The accomplice . . . is criminally responsible for acts which are the direct, proximate, natural result of the cons, piracy formed," but "[he] is not responsible for any special act, not within the scope of the common purpose, but grow[ing] out of the individual malice of the perpetrator. 1 Wharton Crim.Law, § 397." Kellerv. State, 380 So.2d 926, 935 (Ala.Cr.App. 1979), cert. denied,380 So.2d 938 (Ala 1980).
The capital offense of which this defendant was convicted, see § 13A-5-40(a)(7), Ala. Code 1975, require. (1) proof of an intentional murder and (2) proof that the murder was committed for pecuniary gain, or pursuant to a contract, or or hire.Sockwell v. State, 675 So.2d 4, 24 (Ala.Cr.App. 1993). We agree with the defendant that his intent that Pope kill Elmer Woodall pursuant to a contract could not supply the intent necessary to convict the defendant for the capital murder for-hire of Clemer Woodall. Cf. Tomlin v. State, 591 So.2d 550 (Ala.Cr.App. 1991) (holding that under the accomplice liability doctrine, a nontriggerman accomplice may be convicted of double murder, a capital offense under § 13A-5-40(a)(10), Ala. Code 1975, only if he had the particularized intent that both victims be killed). Rather, in order to convict the defendant of the capital offense charged, the state had to prove, beyond a reasonable doubt, that the defendant intended that Clemer Woodall be killed and that she was killed "for a pecuniary or other valuable consideration or pursuant to a contract or for hire." Sockwell, supra.
"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the state, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485
(Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985)." Powe v.State, 597 So.2d 721, 724 (Ala. 1991). It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt, Pennington v. State, 421 So.2d 1361
(Ala.Cr.App. 1982); rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. Davis v. State, 598 So.2d 1054
(Ala.Cr.App. 1992). Thus, "[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040,1042 (Ala. 1978) (emphasis original).
The evidence tended to show that the defendant hired Pope expressly to kill the defendant's brother, Elmer Woodall. The evidence further indicated that, although he told Pope that Elmer Woodall lived alone, the defendant was aware that his mother, Clemer Woodall, resided at the house with Elmer Woodall. Pope testified that once he was in Alabama, but before committing the shootings, he telephoned the defendant in Kansas and that the defendant told him that the other person at the house was probably his sister from Florida and that "if she gets in the road she has got to go." Pope said he understood this to mean that whoever was present when the murder took place would have to be killed so that there would be no *Page 659 
witnesses. The defendant argues that Pope's testimony on this issue is not believable, but our function is only to assess whether the evidence is legally sufficient to sustain the defendant's capital murder conviction, not to second-guess the jury's assessment of the credibility of the testimony. We conclude that there was sufficient evidence to allow the jury to infer that the defendant hired Pope and intended that Pope, if doing so was necessary to complete his primary task of killing Elmer Woodall, should also kill Clemer Woodall or anyone else present who might be a potential witness to the crime. The defendant's claim on this ground is due to be denied.
 II.
The defendant argues that his capital conviction and death sentence must be reversed because, he claims, the state failed to present sufficient evidence to corroborate the testimony of his accomplices, Freddie Glenn Pope and John Kennon. He did not raise this claim below, therefore, we review it only for the purpose of determining whether "plain error" occurred. See Rule 39(k), Ala. R.App.P.
Section 12-21-212, Ala. Code 1975, provides:
 "A conviction of felony cannot be had on the testimony of all accomplice unless corroborated by other evidence tending to connect that defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
The Court of Criminal Appeals, explaining this statute, has written:
 "The test for determining whether there is sufficient corroboration of an accomplice's testimony is a subtraction process. Senn v. State, 344 A.2d 192, 193 (Ala. 1977).
 "`"First, the evidence of the accomplice must be eliminated, and then, if upon examination of all other evidence, there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration. . . ."'
"McCoy v. State, 397 So.2d 577, 585 (Ala.Cr.App.), cert. denied,397 So.2d 589 (Ala. 1981) (citations omitted; emphasis in original).
 "`"`[C]orroborative evidence need not refer to any statement or fact testified to by the accomplice. Neither must it be strong nor sufficient of itself to support a conviction. The probative value of the evidence need only legitimately tend to connect the accused with the crime and need not directly do so. Further, corroborative evidence need not directly confirm any particular fact nor affirm each and every material fact testified to by the accomplice. Corroboration may be proven by circumstantial evidence alone.'
 "`"Mills v. State, 408 So.2d [187] at 191 [(Ala.Cr.App. 1981)]."'"
Banks v. State, 647 So.2d 46, 49 (Ala.Cr.App. 1994) (citation omitted).
In the instant case, there was the following corroborative evidence: The prosecution introduced undisputed evidence that the defendant and members of his family had been involved in a long-standing legal dispute over the property in Elmore County where Elmer and Clemer Woodall resided.[2] Elmer Woodall testified that Pope arrived at his property in an automobile bearing license plates from Kansas, the state where the defendant resided. Elmer Woodall further stated that Pope had with him a map of the property with distinctive markings upon it that allowed Elmer Woodall to identify the map as one he had sent to the defendant several months earlier in connection with settlement negotiations regarding the family property. And finally, Mark Finnegan, the son of the defendant's girlfriend, testified that, after the defendant had returned to Kansas after attending his mother's funeral and having been questioned by Alabama investigators, *Page 660 
the defendant and he were driving around together when the defendant stated to him, "I think they got me this time, Mark." We conclude that there was sufficient evidence to corroborate the testimony of the accomplices, Pope and Kennon.
 III.
The defendant argues that when he took the stand on his own behalf the state improperly impeached his testimony and attempted to show that he had a propensity for violence, by initiating, on Cross-examination, an inquiry into his character and then presenting evidence of specific prior bad acts. The defendant did not properly preserve this alleged error in the trial court and did not argue it in the Court of Criminal Appeals. Thus, we review this alleged error only for "plain error." See Rule 39(k), Ala.R.App.P.
On cross-examination the prosecutor asked the defendant, "You are not a violent person, are you?" The defendant answered that he was not. The prosecutor also asked the defendant whether he had ever been the person to "hit first" in a fight. The defendant denied being able to recall any time when he had been. The State responded by introducing evidence of an altercation between the defendant and a coworker that occurred in 1980, when the defendant was employed by the Boeing reports Military Airplane Company ("Boeing"). Boeing reports admitted into evidence stated that an internal investigation revealed that the defendant had hit a coworker in the head with his fist after the other man had called the defendant a "son of a bitch" because the defendant would not allow him to use a certain vehicle. A scuffle ensued and the men were separated. As a result of the incident, the defendant was dismissed from Boeing for violating a company rule against fighting.
The prosecutor then elicited evidence of another physical confrontation regarding the defendant, this time with an inmate during the time the defendant was in jail awaiting trial on the present charges. The prosecutor asked, "Do you always back up from contact with people, physical contact?" The defendant responded, "Just a good idea to back up." The prosecutor then asked the defendant whether he had "ever been into any confrontation with anybody while you have been in jail" and whether he had "had occasion to push [an inmate] into a wall." The defendant conceded that he had, because, he said, he believed the inmate had been talking about his case.
Finally, the prosecutor questioned the defendant about whether he had ever assaulted a child with a baseball bat. The defendant denied that he had ever done that. On rebuttal, the state called Mark Woodall, the defendant's 33-year-old estranged son, who testified as follows on direct examination by the prosecutor:
 "Q. Mark, I want to call your attention to back on April 4th of 1976 and ask you if you could relay to the jury whether or not anything happened while you and some friends were playing baseball?
"A. Yes, I can.
 "Q. If you would, please tell the ladies and gentlemen where you were and what happened.
 "A. We were out at the farm in Rose Hill. If I remember right, it was a Sunday afternoon. We were all playing baseball. There were probably around five or six kids. The adults were — some of them were outside doing work in the yard. J.C. had came out to the farm as we were playing baseball and decided to join in the game. As it was my turn to go up to bat, the ball was pitched to me. I hit the ball. And as I ran to first base, I was greeted by J.C. with a ball bat, was hit. knocked on the ground, and continued to be hit with his fists and the baseball bat.
 "Q. Mark, did you say anything to him when this went on?
 "A. After he stopped, I said, `You will not get away with this' and he —
 "Q. Let me ask you this, Mark. How old were you at the time?
"A. I was thirteen.
"Q. When you said that to him, what happened?
 "A. When I said that to him, I was beat again with the baseball bat and his *Page 661 
hands until a neighbor across the street came over and intervened [in] the fight.
"Q. Did you have to go to the emergency room?
"A. Yes, I did.
"Q. Pardon?
 "A. I went to the emergency room. When the doctor examined me he asked me if I wanted to see my father again, and I said, `No, definitely not.'"
(R.T. 1555 56.)
During closing argument, the prosecutor referred to this beating incident. The trial court subsequently instructed the jury that it was to consider evidence of the defendant's violent past acts only for purposes of impeachment and that it could not use that evidence to draw any conclusions regarding his character.
In its brief, the State attempts to justify the admission of this evidence showing the defendant's specific prior violent conduct, by emphasizing that the defendant testified on cross-examination that he was not violent and that he sought to avoid physical confrontations. These broad assertions, the State contends, opened the door to questions regarding his character and permitted evidence of the prior bad acts as impeachment. We disagree.
"Good or bad character of the accused is never an issue upon which the state may offer evidence to prove guilt unless the accused has first chosen to make it an issue." C. Gamble,McElroy's Alabama Evidence, § 27.02(1) (5th ed. 1996) (footnote omitted). "[T]he state cannot initiate the proving of the defendant's bad character to prove his guilt. `In a criminal prosecution, it is generally agreed that the state is not allowed to introduce evidence of the accused's bad character until the accused has first entered evidence of his good character.'"Dockery v. State, 659 So.2d 219, 220-21 (Ala.Cr.App. 1994) (citation omitted). See also Ala. R. Evid. 404.[3]
The State's argument in this case is identical to one rejected by the Court of Appeals of Georgia in a case with similar facts. In Arnold v. State, 193 Ga. App. 206, 387 S.E.2d 417 (1989), the prosecutor had on cross-examination asked the defendant three times whether he was a violent person. After the defendant responded by denying that he was violent, the prosecutor asked the defendant whether he had been convicted of aggravated assault. The defendant responded, "Yes[, but] that happened when I was young." 193 Ga. App. at 207, 387 S.E.2d at 418. On appeal, the defendant claimed that the prosecutor had improperly impeached his testimony and had attempted to show bad character. The prosecutor countered by contending that the questioning of the defendant regarding his prior conviction was permissible on the basis that the defendant had put his character in issue through his answers, given on cross-examination, indicating that he was not violent. The Court of Appeals rejected that argument and reversed the defendant's conviction, stating:
 "[T]he defendant did not voluntarily place his character in issue. He merely responded to questions which placed his character in issue, . . . This line of cross-examination was obviously an endeavor to compel defendant to respond to questions which placed his character in issue and which insured an excuse for the state's introduction of evidence of defendant's prior criminal record. We disapprove of this endeavor and adhere to the rule that the State cannot rebut or question the presumption of a defendant's good character unless the defendant first chooses to place his character in issue. . . . [S]ince defendant did not voluntarily elect to place his character in issue, the trial court erred in allowing the State to attempt to impeach defendant and place his character in issue through the introduction of evidence of defendant's prior criminal record."
193 Ga. App. at 207-08, 387 S.E.2d at 419-20 (emphasis original).
We conclude that the reasoning of the Arnold court is persuasive here. The justification *Page 662 
the State offered in this present case for, the admission of the evidence of the defendant's prior uncharged violent conduct, i.e., that his answers on cross-examination indicating that he was not violent opened the door to questions regarding his character, is due to be rejected. It may not be said that the defendant chose to put his character at issue merely by responding to the prosecutor's cross-examination designed to elicit testimony on that subject. Cf. Wilson v. Gray,605 So.2d 385 (Ala. 1987) (wherein this Court noted its agreement with the trial court's determination that a civil defendant could not be impeached regarding his affirmative response to the question asked on cross-examination, whether the defendant considered himself to be a "responsible contractor," because the question asked by the plaintiff's counsel was an improper inquiry into the defendant's character).
Nor can we conclude that the defendant voluntarily chose to place his character in issue by virtue of his testimony on direct examination and thereby justified the prosecutor's line of cross-examination into his propensity for violence and specific acts indicating that propensity.[4] Although the state does not advance this argument in its brief, it might be claimed that the defendant had done so by giving direct testimony in which he indicated that he "would" not "under any circumstances" "ever" have hired someone to kill his mother or have told Pope that it was "okay" to kill her. However, we do not believe that such ambiguous statements, which appear to have been made in the context of attempting to show that the defendant had a close and loving relationship with his mother, and, hence, no motive to kill her, can be fairly construed as an unequivocal assertion of good character that would justify cross-examination about prior violence against others generally. Compare United States v.Collier, 29 M.J. 365 (C.M.A. 1990) (holding that a defendant's answer on direct examination that he "would have at eased" if ordered to do so by a particular superior officer was not an unequivocal assertion that he possessed the character trait of obedience to orders, because the defendant's answer could be explained by showing a special relationship to that superior officer), with State v. Guritz, 134 Or. App. 262, 894 P.2d 1235
(1995) (upholding trial court's allowing state's cross-examination of defendant charged with sodomizing his five-year-old daughter, regarding his having been cited for purchasing *Page 663 
marijuana during a trip to the park with the victim, based upon the fact that the evidence of such misconduct directly contradicted defendant's extended testimony on direct examination detailing how he was a good father with a close relationship to the victim).
Furthermore, even if the defendant had chosen to place his character in issue, by presenting evidence that it was good, the state generally would not be permitted to present evidence showing that he was in fact guilty of committing prior specific uncharged bad acts:
 "It is not permissible in Alabama to prove the good or bad character of either a defendant or a witness to fortify or impeach his testimony by proving particular acts. Lowery v. State, 98 Ala. 45, 13 So. 498 (1893); Carroll v. State, 555 So.2d 805
(Ala.Cr.App. 1989). The rule in Alabama is stated as follows:
 "`A witness may not be cross-examined for impeachment as to specific acts of misconduct by him which have no relevancy except; as tending to show that he is a person of bad character as a whole or with respect to truth and veracity. . . .'
 "`This rule of excluding questions on cross-examination about specific bad acts of the witness does not apply to exclude prior criminal acts involving moral turpitude for which the witness has been convicted. . . .'
 "C. Gamble, McElroy's Alabama Evidence, § 141.01(10) (3d ed. 1977) (footnotes omitted).
 "`One of the cardinal principles of the common law is that a person's character, good or bad, offered for the purpose of showing his conduct on a specified occasion, is not provable by evidence of his specific acts or course of conduct. The policy behind the rule is that the reception of such evidence would result in an intolerable confusion of the issues.
 "`The most commonly applied form of the above principle is found in the rule that the criminally accused may not prove his good character, as tending to show that he did not commit the crime in question, by showing prior specific good acts. It is, of course, the right of the accused to introduce his good character but only by means of general reputation. Once the accused introduces evidence of his good character, the door is opened for the prosecution to rebut with proof of his bad character. However, the prosecution may not prove the accused's bad character by showing prior specific acts. The prosecution, like the accused, is relegated to proving character via general reputation.'
"Id. at § 26.01(1) (footnotes omitted).
 ". . . [I]t is well settled in Alabama that particular independent facts, though bearing on the question of veracity, cannot be put into evidence for the sole purpose of discrediting the witness. Grooms v. State, 228 Ala. 133, 152 So. 455 (1934); Carroll v. State, supra. In addition to the reason given in McElroy's for the policy behind this rule, i.e., that the admission of such evidence would result in an intolerable confusion of the issues, another important policy reason for the rule is that `[t]he accused may always be prepared to meet an attack on his general character, but cannot fairly be required, without notice, to defend against every possible aspersion which may be made against him, or to controvert particular facts.' P. Herrick, Underhill's Criminal Evidence § 197 (5th ed. 1956) (footnotes omitted)."
Snyder v. State, 644 So.2d 1289, 1293 (Ala.Cr.App. 1994). Accordingly, the trial court erred in allowing the state to present evidence to prove that the defendant had in fact committed the three prior uncharged violent acts; that evidence was improper impeachment and tended to suggest that the defendant was predisposed toward violence and thus was more likely to have committed the crimes charged. The question still remains, however, whether the admission of the evidence showing the defendant's commission of the three violent acts rises to the level of "plain error" requiring reversal of the defendant's capital conviction and death sentence.
In Ex parte Johnson, 507 So.2d 1351 (Ala. 86), this Court held it plain error to admit *Page 664 
into evidence a fingerprint record card of a capital defendant, containing a list of dates and prior arrests of the defendant for other offenses. After implicity recognizing that "`[p]rior arrests of the accused on other charges which have no relevancy except as tending to show his bad character are not admissible,'" 507 So.2d at, 1353 (citation omitted), we stated:
 "[T]he proper inquiry here is not whether evidence of the defendant's guilt is overwhelming but, instead, whether a substantial right of the defendant has or probably has been adversely affected. . . .
 "In the present case, the copy showing the front of [the finger print card] contained information which clearly revealed the defendant's past contacts with law enforcement agencies. From this the jury could have readily inferred, at a minimum, that he had been arrested in the past. In our view, such an inference would have had an almost irreversible impact upon the minds of the jurors."
Id. at 1356-57.
The Court of Criminal Appeals has, similarly, reversed a conviction under the plain error standard on the grounds that the trial court improperly admitted evidence of the defendant's bad character. In Tabb v. State, 553 So.2d 628 (Ala.Cr.App. 1989), the defendant had been found guilty of the capital offense of murder during a rape in the first degree. At trial, a police investigator testified that the defendant had told him that he was in Alabama "because he was a drug addict and to get off cocaine." 553 So.2d at 630. The Court of Criminal Appeals stated, "We can find no purpose in the elicitation of this testimony, other than to show the bad character of the appellant." id., specifically noting, however, that the defendant did not testify at trial, id. at n. 1. The prosecutor, in closing argument, again mentioned the investigator's testimony that the defendant was "trying to get off cocaine." Id. The Court of Criminal Appeals concluded that the defendant's substantial rights had been affected, reasoning that his defense was based largely upon a claim of truthfulness, and that the state's introduction of improper testimony directly undermined his defense theory by suggesting that, because he was a drug addict, he was of bad character and lacked credibility. Id. at 631.
We conclude that the error in this present case is comparable to the errors in Johnson and Tabb, supra, and that it rises to the level of plain error. The state introduced evidence indicating that the defendant had been involved in three separate incidents, strongly implying a pattern of violent behavior. Especially troubling is the admission of direct testimony from Mark Woodall stating that, 20 years before trial and 13 years before the commission of the charged offenses, and while Mark Woodall was a child, the defendant had severely beaten him with a baseball bat, necessitating a trip to the emergency room. We believe that this testimony, which was again referred to by the prosecutor in closing arguments, "would have had an almost irreversible impact upon the minds of the jurors." Johnson
supra, 507 So.2d at 1357. Furthermore, the defendant's defense was based almost entirely upon the jury's finding his trial testimony asserting his innocence to be more credible than the accusations leveled by Pope and Kennon. Thus, the trial court, by allowing improper impeachment of the defendant's testimony, substantially undercut his defense, and his substantial rights were probably adversely affected. We hold that this plain error requires the reversal of the defendant's murder-for-hire capital conviction and his sentence of death. Accordingly, the case must be remanded on that ground.
However, in addition to being convicted of' the capital murder-for-hire of Clemer Woodall, the defendant was also convicted of the attempted murder of Elmer Woodall, for which the defendant received a sentence of life imprisonment. Still remaining, therefore, is the question of what action, if any, this Court should take with respect to this latter conviction, given our conclusion that plain error occurred at the defendant's trial. Under Rule 39(k), Ala.R.App.P., this Court is required to review the record for plain error "[i]n all cases in which the death penalty has been imposed." This plain error review operates as a "safeguard to insure *Page 665 
that the death sentence is not being imposed arbitrarily or capriciously." Beck v. Alabama, 396 So.2d 645, 664 (Ala. 1981). As the United States Supreme Court stated in Woodson v. NorthCarolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944
(1976):
 "`[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.'"
Quoted in Knight v. State, 675 So.2d 487, 496
(Ala.Cr.App. 1995).
Because the defendant in this case was sentenced to death, we have complied with our obligation under Rule 39(k) and conducted a plain-error review. However, with respect to his attempted murder conviction, for which he received a sentence of less than death, we do not believe the defendant is entitled to benefit from our plain error review. We have found no Alabama decision dealing with the particular situation present here: a case in which plain error necessitated a reversal on a capital conviction and death sentence but in which the defendant was also sentenced to a term of imprisonment on mother conviction. However, the defendant's sentence of imprisonment for his conviction of attempted murder does not implicate the same heightened degree of concern for reliability that attended his sentence of death for the capital conviction. It is well established that where a defendant receives only a prison sentence the plain-error doctrine is not applicable, and an appellate court will not consider an alleged error that the defendant failed to preserve by making a proper and timely objection in the trial court. SeeBiddie v. State, 516 So.2d 846 (Ala. 1987); Harris v. State,347 So.2d 1363 (Ala.Cr.App. 1977), cert. denied, 347 So.2d 1368 (Ala. 1978). Indeed, it has been said that the plain-error doctrine "applies to death penalty cases, but not to other convictions."Pugh v. State, 355 So.2d 386, 389 (Ala.Cr.App.), cert. denied,355 So.2d 392 (Ala. 1977) (citations omitted) (emphasis added).
Had the defendant been convicted and sentenced to a term of imprisonment on the attempted murder count but either acquitted or sentenced to life imprisonment without the possibility of parole on the capital murder count, the plain-error doctrine would not have applied. Thus, we would not have even considered the error upon which we have predicated our reversal of his capital conviction and death sentence: the state's questioning of the defendant regarding his character and the subsequent introduction of evidence of specific incidents tending to indicate a propensity for violence. No objection to that questioning was raised at trial. The defendant should not be put in a more favorable position with respect to our review of his noncapital conviction simply because he was also found guilty of a capital offense and was sentenced to death. Thus, we conclude that the defendant's failure to object to the state's inquiry into his character or to the introduction of evidence of the three violent incidents precludes this Court from considering those grounds as the foundation for a reversal of his attempted-murder conviction, for which he received a sentence of less than death.
The defendant raises a number of other issues in his brief. Many of these pertain to the propriety of the sentencing phase of the trial or of the infliction of the death penalty itself; given our reversal of the defendant's capital conviction and death sentence, we need not address these claims at this time. of the defendant's remaining claims, we conclude that they were adequately addressed by the Court of Criminal Appeals in its opinion or that, with respect to the defendant's noncapital conviction, they were not properly presented for our review.
We have determined that, on the capital murder-for-hire count, the evidence was sufficient to establish guilt and that the accomplice testimony was sufficiently corroborated. However, we conclude that it was plain error to allow the State to question the defendant regarding his character and to admit evidence indicating that the defendant had been guilty of uncharged prior violent conduct on *Page 666 
three separate occasions. This evidence was not admissible to impeach the defendant's testimony, nor to prove his had character. We also conclude that this plain error probably adversely affected the substantial rights of the defendant; his capital murder conviction and death sentence are, therefore, reversed and the case is remanded for further proceedings. However, because the defendant failed to object to this plain error at trial, we hold that it cannot form the basis for a reversal of his attempted-murder conviction, for which he received a sentence of life imprisonment. Because we find no properly preserved error warranting reversal of that noncapital conviction, it is hereby affirmed, as is the sentence for that conviction.
NONCAPITAL CONVICTION AND SENTENCE AFFIRMED; CAPITAL CONVICTION AND SENTENCE REVERSED; REMANDED FOR FURTHER PROCEEDINGS ON THE § 13A-5-40(a)(7) CAPITAL CHARGE.
HOOPER, C.J., and MADDOX, ALMON, HOUSTON, COOK, SEE, and LYONS, JJ., concur.
[1] Although we reverse the defendant's capital murder conviction and remand for a new trial on that count, based upon the state's questioning and its introduction of evidence, regarding the defendant's character, we deem it appropriate to address, under our plain error review, his contentions that the evidence was insufficient to establish his guilt or to corroborate the accomplice testimony on the capital murder count. This is because the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution would bar a retrial if the defendant is correct in arguing that the evidence was either insufficient to establish guilt, see Ex parte Roberts,662 So.2d 229 (Ala. 1995), or insufficient to corroborate the accomplice testimony, see McCoy v. State, 397 So.2d 577 (Ala.Cr.App.), cert. denied, 397 So.2d 589 (Ala. 1981).
[2] Proof of motive alone is not generally enough to satisfy the corroboration requirement of § 12-21-222. McCoy v. State,397 So.2d 577, 587 (Ala.Cr.App. 1981). However, evidence of motive is legitimate evidence that may be used to corroborate an accomplice's testimony. Thompson v. State, 374 So.2d 388 (Ala. 1979).
[3] We note that the trial in this case began before January 1, 1996; therefore, the Alabama Rules of Evidence do not apply. Rule 1103, Ala.R.Evid.; see Norfolk Southern R.R. v. Thompson,679 So.2d 689, 693 n. 1 (Ala. 1996).
[4] It is well established that an accused who voluntarily takes the stand is generally subject to impeachment, as is any other witness, Ex parte Pippens, 621 So.2d 961 (Ala 1993). Thus, in order to test the veracity of a testifying defendant, the prosecution generally could, under the evidentiary rules applicable at the time of the defendant's trial, cross-examine a defendant about his prior convictions for crimes involving moral turpitude, see § 12-21-162, Ala. Code; Ex parte Bankhead,585 So.2d 112, 122 (Ala. 1991), but not about uncharged misconduct, see Ex parte Jefferson, 473 So.2d 1110, 1115 (Ala. 1985). Further, a defense witness who testifies to the good character of the accused may be also questioned about having heard about relevant specific instances of misconduct by the accused that would be inconsistent with the good character asserted on direct examination, not to prove the accused's bad character but rather to test the foundation and knowledge of the witness's character testimony. See, e.g., Jarrell v. State, 251 Ala. 50, 36 So.2d 336
(1948); Breeding v. State, 523 So.2d 496, 502 (Ala.Cr.App. 1987);Smith v. State, 446 So.2d 68, 73 (Ala.Cr.App. 1984); see also C. Gamble, McElroy's Alabama Evidence § 27.01(5), (6) (5th ed. 1996). Thus, it has been recognized that should an accused be permitted to testify to his own good character, then the prosecution could similarly ask on cross-examination about relevant prior instances of inconsistent misconduct. See C. Gamble, McElroy's Alabama Evidence § 26.02(9) (5th ed. 1996). However, even if a character witness denies on cross-examination having heard of or being aware of the inquired-about specific misconduct of the subject person is actually guilty of the misconduct, even to impeach the witness. Hussey v. State, 87 A.a 121, 6 So. 420 (1889); see also Abston v. State, 548 So.2d 624,627 (Ala.Cr.App. 1989) (holding that the objective truth or falsity of reports concerning a witness were not subject to further proof because such truth or falsity was a collateral matter). In any event, because we conclude that this defendant did not, through his direct examination testimony, assert that he was of a good character, the State was not permitted to cross-examine him regarding his alleged violent confrontations with others that did not result in criminal convictions, even if one assumes that other witnesses who attested to the defendant's nonviolent nature might have been questioned about having heard of such violent incidents. See Walker v. State, 205 Ala. 197,200, 87 So. 833, 836 (1921).