The appellant, Willie Thomas Burton, Jr., was indicted for the capital offense of arson-murder. He was convicted of reckless murder, a violation of § 13A-6-2(a)(2), Ala. Code 1975, and first-degree arson, a violation of § 13A-7-41, Ala. Code 1975. The trial court sentenced him, as a habitual offender, to serve consecutive terms of imprisonment for life without the possibility of parole. See
§ 13A-5-9(c)(3), Ala. Code 1975. The appellant filed a motion for a new trial and an amended motion for a new trial, which the trial court summarily denied. This appeal followed.
The State presented evidence that the appellant and the victim, Teresa Burton, were married; that the appellant had previously been violent toward the victim; that emergency personnel received a call about a fire at the Burton residence at 5:47 p.m. on March 25, 2004; that the appellant pulled the victim out of the house, put out the fire that was on her, and left; that the victim's clothes were damaged by the fire, but the appellant's were not; that the victim sustained burns to approximately 96 percent of her body; and that, after receiving medical treatment, the victim died as a result of the burns. An autopsy revealed that the victim's blood alcohol content was .123.
Neighbors and medical personnel testified that the victim repeatedly stated that the appellant had thrown gasoline on her and set her on fire. One neighbor testified that, when the appellant came out of the house with the victim, he said, "`I'm sorry. I'm sorry. I burnt her.'" (R. 846.)
Jimmy Townsend, who worked with the appellant, testified that the appellant telephoned him the next morning and asked him for a ride to the police station. At that time, the appellant said that he "F'd up" and that
 "him and his wife got into an argument. They had been drinking that night. And the gas can was sitting on the front porch. And he grabbed the gas can and throwed it on her, and throwed the gas on her and lit her up. And he burnt himself on both arms trying to put her out."
(R. 939.) Townsend testified that the appellant told him they were arguing because the victim had told him "that she had a man could F better than he could." (R. 945.) Finally, he testified that the appellant's *Page 847 
clothes were smoky and that he had burns on each arm.
While the appellant was speaking to law enforcement officers about the incident, the following occurred:
 "SMITH: And I'm an investigator with the police department and uh you already know Investigator Sharp.
 "BURTON: Yes sir.
 "SMITH: Ok, and (SKIPS) a lawyer one will be appointed to represent you before any questioning if you wish. With these rights in mind, do you wish to talk to Investigator Sharp and myself?
 "BURTON: Yes sir.
 "SMITH: Ok uh, (SKIPS) it is my understanding or let me ask you something else before we get started. Right now, I mean at this moment you are not, are you under the influence of any alcohol?
 "BURTON: (NOISES) we was drunk. (NOISES) whiskey.
 "SHARP: Who was we?
 "BURTON: My wife and I.
 "SHARP: Ok, so tell us about the —
 "BURTON: We was man we got into a heated argument. I jumped up right there and got a gas can. I didn't know no lot of gas was in it and when I come in the door she hit the gas can and it doused on her. How it ignited, I couldn't tell you. Me and her both was drunk. Had to be a cigarette in the ashtray or something. As far as I don't remember nothing else. But I remember when it ignited it got on her and I went over there and tried to put it out. I put her out and I drug her out of the house.
 "SHARP: Why did you go get a gas can?
 "BURTON: Why did I go get one? I just, it was just a heat of the moment thing. I ain't had no intention of doing nothing with it.
 "SMITH: And what did you do with the gas can?
 "BURTON: I came in the house with it and she hit it.
 "SMITH: Uh huh. She hit it?
 "BURTON: Yes sir, she hit the gas can.
 "SMITH: Hit it like, hit it hit it like this?
 "BURTON: Tried to take it away from me. Me and her was wrestling with it. Yeah.
 "SMITH: Ok, ok. You brought it in the house.
 "BURTON: Yes sir, I brought it in the house.
 "SMITH: Where did you get it from?
 "BURTON: It was out there out beside my right around the corner of the house.
 "SMITH: Did you open the spout or anything on it.
 "BURTON: All I remember is grabbing it up.
 "SMITH: So does she smoke, your wife?
 "BURTON: Yes sir. Both of us smoke.
 "SMITH: Ok, ok. But right now you are not under the influence of alcohol, is that correct?
 "BURTON: No sir.
 "SMITH: Are you under the influence of any drugs or anything?
 "BURTON: No sir.
 "SMITH: Ok, are you talking with us with a clear (SKIPS)
 "BURTON: (SKIPS)
 "SMITH: Ok, so y'all were drinking yesterday?
 "BURTON: Drinking heavy. *Page 848 
 "SMITH: Is there anything going on in your life I mean that is causing you stress or anything between you and your wife?
 "BURTON: Oh, yeah she just recently came back, you know she had left for a couple of weeks. She had recently came back and we got to arguing.
 "SHARP: What was the argument about?
 "BURTON: About some guy she was supposed to be messing with.
 "SHARP: What's his name?
 "BURTON: She said his name was Cedric.
 "SMITH: Did she tell you this or did you find it out?
 "BURTON: Yeah, she told me this.
 "SMITH: Is this what y'all was arguing about last night?
 "BURTON: Yes sir.
 "SHARP: How long have you been married?
 "BURTON: Twenty, twenty something years. About twenty one or twenty two years.
 "SHARP: Have you had arguments before?
 "BURTON: Yes sir.
 "(SKIPS)
 "SHARP: So tell us about what happened when (SKIPS)
 "BURTON: The gas can she grabbed it and we was wrestling with it.
 "SHARP: Ok, why was she wrestling with it?
 "BURTON: I guess she thought I was fixing to pour it on. She didn't, I mean she didn't want me to pour it on her.
 "SHARP: She didn't want you to pour it on her?
 "BURTON: Naw, un huh. I had the can I told her I am fixing to dash the gas on you and she grabbed it.
 "SHARP: So you said that you were going to put the gas on her?
 "BURTON: I told her that.
 "SHARP: And you remember saying that?
 "BURTON: Yeah.
 "SMITH: What made you say that, was you upset about the Cedric situation?
 "BURTON: Yes sir.
 "SHARP: (SKIPS)
 "BURTON: Naw I got deep burns from putting her out.
 "SHARP: Ok, but when she knocked it out of your hands, did any gas get on you?
 "BURTON: Yeah. Got on, I guess some of it got on my hands.
 "SHARP: On your hands, nowhere else?
 "(SKIPS)
 "SMITH: When you dragged her out of the house.
 "BURTON: Yeah I dragged her out, I put her out, drug her out of the house. I panicked man I panicked and I took off I was scared to death.
 "SMITH: What direction did you take off?
 "BURTON: I went, I went back at the house and got in that creek.
 "SMITH: So you went to the back of your house?
 "BURTON: Yes sir, yes sir.
 "SMITH: Is there a fence in your yard or anything?
 "BURTON: Yes sir, yes sir.
 "SMITH: Did you go through a gate or over the fence?
 "BURTON: Over the fence. *Page 849 
 "SMITH: And you went, where did you go from there?
 "BURTON: Aw the creek go a long way down there, I walked to the end of the creek and just sat there. Like to froze to death. I was wet.
 "SHARP: Let me ask you this sir. The house was on fire, your wife was burned. Did you call the fire department or HEMSI.
 "BURTON: My neighbor did, I, I. He come out there and I told him I said would you please call 911.
 "SMITH: (SKIPS) at length and uh and y'all got (SKIPS)
 "BURTON: I was upset, we was drinking man, we was highly intoxicated. We both were.
 "SMITH: Ok."
An arson investigation revealed that the point of origin of the fire was in the den by a couch; that there was a gas can between six and twelve inches away; and that the fire was incendiary, or set by human hands by a person who knew a fire should not be set there, whether intentional or not. There was evidence of gasoline on the victim's clothing and on the carpet from the den, but there was not any evidence of cigarette smoking materials in the den. An arson investigator and a fire debris scientist testified that, in their opinion, a cigarette would not have burned at a high enough temperature to ignite the gasoline.
The appellant argues that the jury's verdicts finding him guilty of reckless murder and first-degree arson were inconsistent and mutually exclusive. Specifically, he contends that "[t]he jury, in finding that [he] acted with recklessness, as to the universal malice murder charge, implicitly acquitted [him] of acting with intent as to the first degree arson charge." (Appellant's brief at p. 13.)
The Alabama Supreme Court addressed a similar situation and discussed inconsistent and mutually exclusive verdicts inHeard v. State, [Ms. 1041265, January 12, 2007] ___ So.2d ___, ___ (Ala. 2007), as follows:
 "Heard was found guilty of more than one offense based on crimes against one victim.
 ". . . .
 "Confusion exists throughout Alabama courts over the difference between inconsistent verdicts and mutually exclusive verdicts. `The general rule is that there need be no rational compatibility between the verdicts on the several counts of an indictment. The exception to this rule is where the jury returns multiple convictions as to crimes which are mutually exclusive of each other. Conway v. State, 489 So.2d 641, 642 (Ala.Cr.App. 1986). . . .' Grikis v. State, 552 So.2d 187, 187 (Ala.Crim.App. 1989). This seemingly straightforward rule has been somewhat difficult to apply because of confusion over the meaning of the terms `inconsistent verdicts' and `mutually exclusive verdicts.'
 ". . . .
 ". . . Mutually exclusive verdicts are the result of two positive findings of fact that cannot logically coexist. In other words, it is legally impossible for the State to prove the elements of both crimes. In order to determine whether the guilty verdicts are mutually exclusive as a matter of law, the alleged underlying offenses or acts must be carefully scrutinized. The two guilty verdicts are not mutually exclusive if no element of one crime necessarily negates an element of the other.
 "Mutually exclusive verdicts exist when a guilty verdict on one count logically excludes a guilty verdict on another count. In contrast, inconsistent verdicts *Page 850 
can exist where there is a verdict of guilty and another of not guilty, as when there are two guilty verdicts that are not mutually exclusive. Inconsistent criminal verdicts are permissible; mutually exclusive verdicts are not.
 "There has been much confusion as to whether the verdicts returned against Heard were mutually exclusive or merely inconsistent. Heard was convicted of both capital murder and felony murder. According to Alabama law, a defendant must have the intent to kill in order to be found guilty of a capital offense. § 13A-5-40(b), Ala. Code 1975; Ex parte Woodall, 730 So.2d 652, 657 (Ala. 1998)('No defendant can be found guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony-murder doctrine.'). Felony murder, on the other hand, does not require the specific intent to kill; it requires only the intent to commit the underlying felony. § 13A-6-2(a)(3), Ala. Code 1975; Mitchell v. State, 706 So.2d 787 (Ala.Crim.App. 1997). The absence of an intent to kill, however, is not necessarily an element of felony murder, as contrasted with the intent to kill, which is an element of capital murder.
 "In other words, a felony-murder conviction does not require proof that the defendant unintentionally killed the victim, only that the defendant intended to commit the underlying felony. Therefore, it is possible that a defendant intended to kill the victim (the element necessary for the capital conviction) while at the same time intending to commit an underlying felony (the element necessary for the felony-murder conviction). Therefore, the most that can be said of the verdicts finding Heard guilty both of capital murder and of felony murder is that they may be merely inconsistent. These two verdicts are not mutually exclusive; they do not contain mutually exclusive essential elements.
 "Because these verdicts are not mutually exclusive, the verdicts should stand; `[t]hat the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation of inquiry into such matters.' Dunn [v. United States], 284 U.S. [390,] 394 [(1932)]."
With regard to reckless murder, § 13A-6-2(a), Ala. Code 1975, provides:
 "A person commits the crime of murder if he or she does any of the following:
 ". . . .
 "(2) Under circumstances manifesting extreme indifference to human life, he or she recklessly engages in conduct which creates a grave risk of death to a person other than himself or herself, and thereby causes the death of another person."
With regard to first-degree arson, § 13A-7-41 (a), Ala. Code 1975, provides:
 "A person commits the crime of arson in the first degree if he intentionally damages a building by starting or maintaining a fire or causing an explosion, and when:
 "(1) Another person is present in such building at the time, and
 "(2) The actor knows that fact, or the circumstances are such as to render the presence of a person therein a reasonable possibility."
As was the case in Heard, the appellant was convicted of more than one offense based on crimes committed against one victim. To be guilty of arson, he must have had the intent to start or maintain a fire. See Henderson v. State,715 So.2d 863 (Ala.Crim.App. 1997); Minnis v. State,690 So.2d 521 (Ala.Crim.App. 1996). "The doctrine *Page 851 
of universal malice, depraved heart murder, or reckless homicide manifesting extreme indifference to human life is intended to embrace those cases where a person has no deliberate intent to kill or injure any particular individual."Haney v. State, 603 So.2d 368, 399 (Ala.Crim.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992).
Assuming, without deciding, that the jury's verdicts in this case were inconsistent, we conclude that they were not mutually exclusive.[1] We have carefully examined the appellant's acts and the offenses for which the jury found him guilty. Based on that review, we find that it was not legally impossible for the State to prove the elements of both offenses because no element of either offense negates an element of the other. Even though reckless murder involves a situation in which the defendant does not intend to kill or injure another person, it does not require that none of his actions be intentional. For example, it does not exclude the possibility that he committed another intentional act, such as setting a fire. Thus, the jury could have reasonably concluded that the appellant acted with extreme indifference to human life but did not intend to kill or injure the victim when he threw gasoline around the den; that the appellant acted intentionally when he started the fire; and that the victim died as a result of both of the appellant's actions. Therefore, the verdicts were not mutually exclusive.Cf. Martinez v. State, [Ms. CR-05-1669, March 2, 2007] ___ So.2d ___, ___ (Ala.Crim.App. 2007) (opinion on return to remand) (applying Heard and holding that the jury's verdicts were mutually exclusive because a single act cannot be both negligent and reckless). Accordingly, the appellant's argument is without merit, and we affirm the trial court's judgment.
AFFIRMED.
McMILLAN, SHAW, WISE, and WELCH, JJ., concur.
[1] Because inconsistent verdicts are permissible according to Heard, we need not determine whether the verdicts in this case were inconsistent.
 *Page 1