WELCH, Judge.
Mark Allen Reid appeals from his conviction for murder, see § 13A-6-2, Ala. Code 1975, and his resulting sentence of 25 years’ imprisonment.
The State presented evidence showing that Billy Banks, a known drug user, was found dead inside his pickup truck on Wyn Road on the morning of July 27, 2010. Banks was lying across the front seat of his vehicle with 11 gunshot wounds.
Thomas Richard Williams, Sr., testified that he was aware that Banks smoked marijuana but that, as far as he knew, Banks did not use other drugs. He also testified that, as far as he knew, Banks always purchased his marijuana from the same person; he did not identify Reid as that person. Williams testified that he did not know Reid. Williams testified that, during the evening of July 26, 2010, Banks had asked him for assistance with a drug deal. Williams said that Banks had taken him to Wyn Road. Williams said that Banks’s plan was for Williams to later drive his own vehicle to the Wyn Road location and to meet Banks there. Banks told Williams that Williams was to drive his vehicle past Banks’s truck, turn around and come back, stop alongside Banks’s truck, and Banks would hand him a package containing 23 pounds of marijuana. Williams said that he was then supposed to give Banks a package of paper wrapped up with duct tape that would appear to be money. Then, Williams said, he was supposed to drive to a location on Creel Road and wait for Banks to meet him there. Banks did not identify the person from whom he would get the marijuana, but he told Williams that the person he dealt with never carried a knife or a gun. Williams testified that, after discussing the matter with his wife, he told Banks that he would not assist him with the plan.
John Wheeler, Jr., testified that Banks was his brother-in-law, and that the two of them used to see each other often and enjoyed a close relationship. Wheeler testified that Banks came to his house at around 8:45 or 9:00 p.m. on the evening of July 26, 2010, and they sat on the porch and drank coffee. Wheeler said he did not notice anything unusual about Banks’s behavior. Banks received a call on his cellular telephone; Wheeler said he heard the caller’s voice, and the caller sounded like a man. Wheeler said he heard Banks tell the caller that he would have to make a phone call and then he would call the man *637 right back. Banks walked into the yard and made a call. When Banks returned to the porch he asked Wheeler if he had any duct tape. Wheeler gave Banks some duct tape and asked Banks why he needed it; Banks told Wheeler that he had to move and he needed to pack his belongings. Wheeler testified that Banks spent a few minutes talking to Wheeler’s grandson, Cody Poole, who was at the house that night, and then Banks left.
On cross-examination, Wheeler testified that he was aware that Banks had served time in federal prison in the 1980s for selling marijuana and cocaine but that, as far as he knew, Banks did not sell drugs after he was released from prison. Wheeler said that he knew that Banks continued to smoke marijuana but that he knew nothing about Banks using methamphetamine or amphetamines.
Cody Poole testified that Banks was his uncle, and that he was aware that Banks smoked marijuana. Poole said that he saw Banks at the Wheelers’ house at around 8:45 or 9:00 p.m. on July 26, 2010. Banks asked Poole “to help him make a box and make it heavy” (R. 184), so Poole put newspaper in a cardboard box and closed it with duet tape. Banks did not tell Poole why he wanted the box. Banks left the Wheelers’ house at approximately 9:15 p.m., and he took the box with him.
Melissa Imel testified that she had been Banks’s lover, and that in July 2010 Banks was living with her part-time in her mobile home. She said that she knew Reid because she had worked with his daughter at a restaurant and that she had seen Reid when he came to the restaurant. Imel testified that she knew that Reid was a drug dealer, that Banks had purchased marijuana from Reid, and that she had been with Banks when he bought marijuana from Reid several times. Imel further testified that she had never known Banks to purchase marijuana from anyone else.
Imel testified that she and Banks had used marijuana and methamphetamine during their relationship, but that they had not ingested methamphetamine together on July 26, 2010. Imel testified that she saw Banks around lunchtime on July 26, 2010, and he told her he was going to get his taxes done with “Nelda.” (R. 189.) Imel testified that they argued because she did not believe him, and she thought he was going to be with another woman. Imel testified that Banks left her mobile home and that she did not hear from him again until approximately 10:00 p.m., when Banks telephoned her and asked her to pick up something for him and to deliver it. They met at a gas station initially, and he told her to wait for his call and then drive to Wyn Road. Banks said he would meet her on Wyn Road and he would signal her with a flashlight, and she was to turn her car around. She did as Banks asked. Imel testified that she did not see any vehicles in the area other than Banks’s white truck, which was parked further down Wyn Road than where she turned her car around, and she did not see anyone but Banks on Wyn Road. Imel said that Banks placed two black garbage bags onto the backseat of her car, and he told her to drive home and that he would be there soon. Imel said she knew the bags contained marijuana, but she did not know how much marijuana was inside. Imel said that she drove to her mobile home, but that Banks did not return to the mobile home and did not answer his cellular telephone when she attempted to contact him that night. She thought he was with another woman, she testified. Imel learned the following morning that Banks had been shot and killed.
Imel testified that, as soon as she heard that Banks had been killed, she retrieved *638 the garbage bags from her car. She and her son opened the bags; one garbage bag contained eight smaller bags of marijuana, and the other garbage bag contained a brick of marijuana. Imel and her son unwrapped some of the marijuana and placed it in other bags, threw one or both of the black garbage bags and some other wrappings into the dumpster behind the mobile home, and hid the marijuana inside the mobile home. Imel testified that she had never seen that much marijuana before. Police officers came to her mobile home and questioned her about Banks, Imel said. She said the police indicated that they did not have a motive for Banks’s murder. Imel said she was scared because she had been in trouble for drugs in the past.
On cross-examination, Imel acknowledged that she had initially lied to the police about having the marijuana in her possession and that she had told the police that her son had thrown the marijuana into the river. She also had told the police that “Mark” was Banks’s marijuana supplier, but she had not disclosed Mark’s last name to the police that day and she had not told them where Reid worked, even though she knew that he worked at a Winn-Dixie grocery store. Imel later showed officers where she had hidden the marijuana. Police recovered 22.7 pounds of marijuana from Imel’s mobile home; the marijuana was worth $23,000. Imel acknowledged on cross-examination that she did not get into Banks’s personal affairs, and that Banks had been very secretive about his involvement with drugs and with other women. Imel further acknowledged that when she and Banks began their relationship, Banks had been living with a woman named “Nelda.”
A man whose residence was located on Wyn Road testified that, on July 26, 2010, he was driving on that road sometime between 10:30 and 10:45 p.m., and he saw a white pickup truck. The driver’s side door was open and the interior dome light was not on. The road is very dark, he said, and even though he drove slowly past the truck, he did not see anyone inside.
On the morning of July 27, 2010, Banks was found dead in his truck on Wyn Road. The medical examiner determined that Banks had sustained 11 gunshot wounds. The medical examiner discovered that Banks had a significant amount of methamphetamine in his system, as well as amphetamines and a metabolite of marijuana.
Law-enforcement officers found numerous shell casings, at least three of which were 9mm casings, and bullet fragments at the scene. Officers also found several cigarette butts in and around the truck. A roll of duct tape was found on the floorboard of the truck. Investigators recovered a handwritten note in the truck from “a lady Mr. Banks was seeing at the time,” Nelda Bunch, who “was angry because she didn’t get a birthday card.” (R. 330-31, 362.)[1] Examination of cellular-telephone records revealed that Banks had contact with Williams and Imel around the time of the murder. Records also revealed eight telephone calls between Banks and Reid on the day of the murder; the last call was at 10:08 p.m. Examination of the cellular-telephone records indicated that Reid’s telephone connected to a cell tower approximately two miles from the scene of the murder. Records revealed that Reid *639 also placed a call to Banks’s cellular phone at 8:33 a.m. on the day after the murder. Banks had a cellular telephone on his person when his body was found. Finally, telephone records revealed that Imel was the last person who spoke by cell phone with Banks on the night of July 26, 2010, at approximately 10:30 p.m.
The Mobile County Sheriffs Office executed a search warrant at Reid’s residence and found a large safe containing weapons, moneygrams, Federal Express receipts, a bullet-proof vest, scented dryer sheets, plastic drug packaging, notes, a small amount of marijuana, and several hundred dollars in cash. Investigators also found a 9mm pistol and numerous 9mm rounds. However, forensic testing later revealed that none of the shell casings found at the scene had been fired from the weapons taken from Reid’s house. All the bullets recovered from Banks’s body had been fired from the same firearm but that firearm was not one of the weapons taken from Reid’s house. During the search of Reid’s house investigators seized a notebook with handwritten entries they thought might have been related to a drug-distribution conspiracy, but authorities acknowledged that they were unable to link the notebook to any such conspiracy involving Reid.
Forensic tests revealed a mixture of DNA on a cigarette butt found inside Banks’s truck; Banks could not be excluded as a contributor to the DNA mixtime. The cigarette butt found on the ground at the scene contained DNA from a male other than Banks. Reid was excluded as a possible contributor of the DNA found on both of the cigarette butts. Reid’s fingerprints were not found on the truck, and his DNA was not found anywhere on the truck.
On appeal, Reid argues that the State’s evidence was insufficient to support his murder conviction. In order to prove a prima facie case of murder, the State had to prove that Reid had the intent to cause Banks’s death and that he did cause Banks’s death by shooting him -with a gun. § 13A-6-2, Ala.Code 1975.
In Ex parte J.C., 882 So.2d 274 (Ala.2003), the Alabama Supreme Court stated the standard used to review a claim that the evidence produced at trial was legally insufficient to support a conviction:
“ ‘ “In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr.App.1984), aff'd, 471 So.2d 493 (Ala.1985).” Powe v. State, 597 So.2d 721, 724 (Ala.1991). It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt, Pennington v. State, 421 So.2d 1361 (Ala.Cr.App.1982); rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. Davis v. State, 598 So.2d 1054 (Ala.Cr.App.1992). Thus, “[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978) (emphasis original).’
“Ex parte Tiller, 796 So.2d 310, 312 (Ala.2001)(quoting Ex parte Woodall, 730 So.2d 652, 658 (Ala.1998)).”
882 So.2d at 277.
The State acknowledges that it presented only circumstantial evidence, *640 but circumstantial evidence is not inferior to direct evidence, “and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant’s guilt.” Ward v. State, 557 So.2d 848 (Ala.Crim.App.1990).
‘“In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.’ ”
Bradford v. State, 948 So.2d 574, 578-79 (Ala.Crim.App.2006), quoting Cumbo v. State, 368 So.2d 871, 874 (Ala.Crim.App.1978) (citations omitted).
The State’s evidence established that Banks had acquired a substantial amount of marijuana at some unknown time before he was killed. The State presented circumstantial evidence that Banks had acquired the marijuana from Reid, because Williams and Imel testified that, so far as they knew, Banks purchased drugs from only one person, and Imel identified Reid as that person. Williams’s testimony about Banks’s plan to give the drug dealer a package of paper instead of money during an upcoming drug transaction might have supported an inference that Banks executed this plan without assistance from Williams or Imel and that he stole the marijuana from Reid. The circumstantial evidence and the inference, considered independently or in combination, did not reasonably permit a further inference that Reid murdered Banks by shooting him repeatedly. In order for a jury to have reasonably found Reid guilty of murdering Banks, it would have had to have inferred that, at some point after Banks gave Imel the two garbage bags containing marijuana and sent her home, Banks remained on Wyn Road while Reid, who was not seen in the Wyn Road area when Imel was there, had at some point opened the package that was supposed to have contained money and discovered that Banks had cheated him; that Reid traveled to Wyn Road and found Banks still there, waiting by the roadside; that Reid was armed with a 9mm firearm; that he confronted Banks and shot him 11 times, killing him; and that he then disposed of the murder weapon. The State is to be accorded all reasonable inferences from the evidence, but the foregoing inferences are not supported by any testimony or other evidence, direct or circumstantial, and none of the inferences are reasonable inferences. As the trial court stated when it considered Reid’s motion for a judgment of acquittal, “I haven’t heard any evidence, forensic or otherwise, that puts [Reid] on Wyn Road at the time or in the time frame that the homicide occurred.” (R. 444.)
“While a jury is under a duty to draw whatever permissible inferences it may from the evidence, including circumstantial evidence, mere speculation, conjecture, or surmise that the accused is guilty of the offense charged does not authorize a conviction. A defendant should not be convicted on mere suspicion or out of fear that he might have committed the crime. While reasonable inferences from the evidence may furnish a basis for proof beyond a reasonable doubt, mere possibility, suspicion, or guesswork, no matter how strong, will not overturn the presumption of innocence.
“An inference is merely a permissible deduction from the proven facts which the jury may accept or reject or give such probative value to as it wishes. It is a logical and reasonable deduction *641 from the evidence and is not supposition or conjecture. Guesswork is not a substitute. A supposition is a conjecture based on the possibility or probability that a thing could have or may have occurred without proof that it did occur. The possibility that a thing may occur is not alone evidence, even circumstantially, that the thing did occur.”
Boyington v. State, 748 So.2d 897, 901 (Ala.Crim.App.1999) (quoting Mullins v. City of Dothan, 724 So.2d 88, 86 (Ala.Crim.App.1998) (emphasis added)(internal quotation marks and citations omitted)).
We have carefully examined the evidence the State presented, and we do not find it sufficient to support an affirmance of the murder conviction. It appears possible, if not likely, that Banks was killed as a result of his drug dealings, but the State failed to present any facts from which a jury could have reasonably inferred that Reid was the killer or that he was even present when Banks was killed. As defense counsel argued when he made his motion for a judgment of acquittal at the conclusion of the State’s case:
“What do they have to connect [Reid] with Wyn Road? Ms. Imel said she didn’t see him. Mr. Williams said he didn’t know him. So, nothing I mean, I think they have to have some modicum of evidence that says that he was there. Circumstantial evidence, what are the circumstances that would lead you to believe that he was there? There are no circumstances.”
(R. 444-45.)
Banks was at his brother-in-law’s house less than two hours before he was murdered; he received a call on his cellular telephone from a man; and he made a telephone call after he spoke with the caller. After Banks obtained duct tape from his brother-in-law and assistance from his nephew, Banks left the house with a heavy, duct-taped box filled with newspaper. Because Banks gave Imel the garbage bags containing the marijuana, it might more reasonably be inferred that Banks had stayed on Wyn Road after Imel left in order to meet with someone who wanted to purchase the 28 pounds of marijuana Banks had actually already given to Imel. If Banks had attempted to give the buyer a heavy box that had no marijuana in it, it is more reasonable to infer that the angry buyer shot and killed Banks after discovering that Banks had attempted to defraud him than it is to infer that Banks had attempted to cheat his alleged long-time drug supplier, Reid, and that Reid traveled to Wyn Road and murdered Banks. However, the defrauded-buyer scenario, like the prosecution’s scenario proposing Reid as a defrauded seller and the murderer, is based on speculation and surmise rather than on any evidence actually implicating Reid. As defense counsel posited in his closing argument, the State’s circumstantial evidence also did not exclude the possibility that Imel, an angry lover and the last person known to have had contact with Banks, shot him on Wyn Road when she met him there before she left with the marijuana. (R. 502-04.) Nelda Bunch apparently was another angry paramour, whose note was on Banks’s truck seat when his body was found, as defense counsel also noted in his closing argument. (R. 499.) Williams was aware of Banks’s plan and the location where the alleged scam was to take place, and he was in contact with Banks near the time of Banks’s murder. Another male’s DNA — not Reid’s— was found on a cigarette butt at the scene, but authorities did not obtain a sample of Williams’s DNA or anyone else’s for comparison purposes.
The State’s incomplete chain of facts in this case required the jury to rely on factually unsupported inferences, and the *642 evidence, even when viewed in the light most favorable to the State, was not sufficient for a jury to reasonably find that it excluded every reasonable hypothesis except that of guilt. Lockhart v. State, 715 So.2d 895, 899 (Ala.Crim.App.1997), quoting Ward v. State, 610 So.2d 1190, 1191 (Ala.Crim.App.1992). A conviction cannot be based on mere possibility and guesswork.
Because Reid’s murder conviction was based on a combination of surmise, conjecture, speculation, and suspicion, rather than on evidence and reasonable inferences, we are compelled to hold that the trial court erred to reversal when it denied Reid’s motion for a judgment of acquittal. Reid’s conviction is due to be reversed and a judgment of acquittal rendered in his favor.
REVERSED AND JUDGMENT RENDERED.
KELLUM, BURKE, and JOINER, JJ., concur.
WINDOM, P. J., dissents, without opinion.

. The note stated:
"You're so ungrateful. If I did not have this, you would be out of luck. I can’t help that you have no job, spend all your money and nothing to show for it. All I wanted for my birthday was a poem printed. I did not get a card from you, but that is okay.”
(R. 362.)